## COMMONWEALTH *vs.* WILLIE MILES JOHNSON.

Hampden. June 16, 1983. August 1, 1985. — October 8, 1985.

Present: DREBEN, KAPLAN & WARNER, JJ.

*Practice, Criminal,* Conduct of prosecutor, Assistance of counsel, Disclosure of exculpatory evidence. *Evidence,* Bias, Prior conviction. *Witness,* Bias, Impeachment.

Judgments in a criminal case were reversed because of overreaching conduct by the prosecutor in seeking to discredit the testimony of defense witnesses by use of outstanding perjury indictments against the witnesses based on their previous testimony with respect to the events in question and in failing to disclose evidence suggesting that a key prosecution witness had testified in expectation of receiving favorable disposition of pending criminal charges against her, and because of defense counsel's failure to take appropriate corrective action in response to the prosecutor's improper conduct. [38-42]

INDICTMENTS found and returned in the Superior Court Department on December 8, 1981.

The cases were tried before *George J. Hayer,* J.

Following remand by this court, further proceedings were had before *William W. Simons,* J.

*Harry C. Mezer* for the defendant.

*William T. Walsh, Jr.,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J.  The proceedings herein were so far compromised by prosecutorial overreaching, and by other faults to be described, that we are constrained to vacate the convictions, the relevant indictments to stand for a new trial. We describe the history of the matter and then recapitulate and comment on certain features of it.

1. *The Course of Proceedings.* The criminal episode, such as it may have been, occurred on November 24, 1981. Paulette Graham, a young woman who had been living with Donald

Brooks, was in the process of parting from him and taking a kind of refuge with the defendant's family or entourage. It may be inferred that there was mutual resentment between Brooks and the defendant, to which may have been added a suspicion on the defendant's part that Brooks had been informing about him to the police. On the day, Brooks (we follow the prosecution's version of the facts) drove up to 111 Mallowhill Road, Springfield, with Graham. At this location the defendant lived with his wife and children. Graham left the car and entered the house. The defendant emerged from the house and struck Brooks in the arm with a two-by-four. He reentered the house, then reappeared, brandished a gun with silencer belonging to him, and threatened to kill Brooks if the police should come to one of his (defendant's) houses. On this basis the Commonwealth in early December procured indictments against the defendant for assault and battery by means of a dangerous weapon, a two-by-four; threatening to commit murder; assault by means of a dangerous weapon, a gun; carrying a firearm as a second offender (but going to the jury as possession without an identification card); and receiving a firearm with altered or defaced serial number.

The defendant had outstanding against him a drug conviction of February 27, 1980, for which he had been sentenced to a term of five to seven years, suspended, probation for two years. On motion to revoke probation, the probation department, assisted by the office of the district attorney, at hearings commencing in Superior Court in Hampden County on December 21, 1981, offered evidence of the event of November 24, and of searches under warrant (procured in respect to other alleged offenses) at 111 Mallowhill Road and at 816 Beacon Circle, Springfield,[1] which had resulted in the seizure of credit cards, a gun, and other materials seemingly incriminating. Appearing as witnesses for the defendant and testifying on his behalf were Graham, the defendant's wife Marilyn, and his son Leonard. The judge on December 24, 1981, found against the defendant, revoked probation, and committed him under the sentence to Walpole.

---

[1] At this location the defendant maintained his mistress Carol Daphnis and their child.

At the time, Paulette Graham was under suspended sentence, with long-term probation "transferred" from New York, for the commission in that State of a serious crime of violence (armed robbery and assault with a razor). And in November-December, 1981, she was charged in District Court with seven offenses: three charges of the fraudulent use of credit cards; two of larceny under $100; one of a threat to murder; and one of intimidation of a witness. The revocation of the defendant's probation evidently prompted Graham to consider what might happen to her. A corresponding realization of Graham's vulnerability led the assistant district attorney, Henry Rigali, to hope and angle for a helpful statement from her. On January 27, 1982, Graham, under questioning by Mr. Rigali (Officer Meara and Sergeant Canevari being also present), did give a statement.[2] She said, in effect, that the testimony she and Marilyn and Leonard Johnson had given at the probation revocation hearings — particularly testimony about the gun that was supposed to have figured in the episode of November 24, 1981 — was wilfully false. According to Graham, the false testimony had been inspired by the defendant himself. When Graham and Carol Daphnis (see note 1, *supra*) visited him in jail, he said with regard to the gun that he wanted it laid on Donald Brooks, otherwise his son Leonard should take the heat. Thereafter, according to Graham, she, Daphnis, and Marilyn and Leonard Johnson (and perhaps others) connived in inventing a story that foisted the gun on Donald Brooks.[3]

On the day she gave her statement, January 27, 1982, Graham, represented by her attorney, Mr. Douglas Winniman, appeared in District Court, admitted to sufficient facts in two of the credit card fraud cases and one larceny case, and received

[2] Graham's then counsel, Mr. Douglas Winniman, was not present during the interrogation. He dropped in to arrange a meeting with Graham for that afternoon, very likely to attend at District Court to plead.

In describing Graham's statement, we omit a good deal about the defendant's (and Graham's) alleged involvement with credit cards and other matters.

[3] This, according to Graham, included the preparation of written statements signed by Graham and Daphnis on or about December 10, 1981.

in each case probation, concurrent with her existing probation, to December 9, 1982 (in fact probation was discharged on that date.)[4] On other dates Graham was similarly let off lightly on the remaining credit card and larceny charges, and the threat and intimidation cases were continued without finding and then dismissed. The probation department did not seek revocation of Graham's probation on the New York offenses.

With the defendant's trial on the incident of November 24 due to start on March 4, 1982, Graham on March 1 appeared before the grand jury for Hampden County and repeated the substance of the statement she had given Mr. Rigali. In consequence, the defendant, Marilyn and Leonard Johnson, Carol Daphnis, and Graham herself were promptly indicted for sundry perjury or perjury-related crimes deriving from the testimony given at the probation revocation hearing.

Trial of the defendant in Superior Court in Hampden County ran a troubled course from March 4 through March 11. Donald Brooks was the main witness for the Commonwealth on its case in chief. On the part of the defense, evidence was given that attempted to deny or extenuate the alleged use of force by the defendant and also questioned any involvement of the defendant with a gun. Leonard and Marilyn Johnson testified in line with their account at the probation revocation hearing. They were joined by Carol Daphnis. Cross-examination by Mr. Rigali, playing upon the material supplied by Graham in her statement to him, sought to show that the testimony given by these witnesses had been cooked at the defendant's instigation.

After the defense rested, Mr. Rigali proposed to call Graham as a rebuttal witness. This led to a wrangle. Earlier in the trial, the prosecutor had indicated that he did not intend to call

---

[4] The facing sheet on the assistant district attorney's file for 81-8610 (credit card fraud) shows in part: "1/25/82: cf. [conference] w/D. Winniman — D to give police statement on 1/26/82 [at] 2 P.M. re W. M. Johnson. submission
Case to be then ~~continued~~ for one yr. w/o finding conc. w/1 yr. probation."
For 81-8809, 81-8810 (threat to murder, intimidation of witness): "~~REC~~
Disp:
facts suff. cont. w/o finding to end of present probation (12/82). See Rick or Henry Rigali for reasons for recommendation."

Graham.[5] Later he suggested that he had a witness but was not sure he would call her (the defense could identify her as Graham). Still later it appeared that he would call Graham, and defense counsel objected on grounds of surprise; she had not appeared among the witnesses proposed to be called. She was allowed to take the stand. A major part of Graham's testimony described a compact initiated by the defendant and carried out by confederates, including herself, to tell a false story that would exculpate the defendant, especially with respect to the gun. Graham admitted she had lied at the probation revocation hearings. Concluding the direct examination, the prosecution elicited that she was then under indictment for crimes of perjury committed at those hearings.

Cross-examining, defense counsel, upon taking a step preliminary to getting Graham to admit to her criminal record in New York, found himself stymied by the fact that he did not have official proof of her convictions.[6] He protested to the judge that this was a consequence of his being surprised by Graham's appearance as a witness; but there the particular attempt at impeachment ended.[7] The defense did not avail itself of the facts of Graham's probationary status or of the District Court charges against her (or the results) as means of suggesting that she was motivated to favor the prosecution and was giving false testimony in the current case.

Graham testified that no promises had been made to her, and Mr. Rigali in his closing statement to the jury said she was before them on her own without a promise, without an

---

[5] This was during discussion about providing counsel for indicted witnesses to advise about self-incrimination. Mr. Winniman appeared in court as adviser to Graham.

[6] What the full record would have disclosed is not known, but it appeared that in New York Graham had committed, at least, the violent crime mentioned above and between twenty and thirty prostitution-related offenses.

[7] The prosecutor said that defense counsel should have been prepared with the records, as counsel had represented the defendant at the probation revocation hearings and had witnessed the prosecutor's embarrassment when he could not impeach Graham because he lacked the records. The prosecutor also said defense counsel had been informed of Graham's statement of January 27, 1982.

indication of leniency if she testified for the Commonwealth;[8] why was she there except to tell the truth? She had turned out to be a courageous little girl. And finally: the Commonwealth stood behind her and believed her. Defendant's counsel allowed all this to pass without protest.

Following the jury instructions, in which the judge said that lawyers' assertions or beliefs were not to count, the jury returned verdicts of guilty of assault and battery by means of the two-by-four, illegal possession of a gun, and receiving a firearm with altered number; not guilty of the other charges. Sentence followed: on the assault, five to eight years' imprisonment at Walpole (from and after the sentence being served upon revocation of probation); on the other convictions, probation of one year after the assault sentence.[9]

From the convictions, the defendant took the instant appeal. Argument before this court took place on June 16, 1983. We were advised by counsel for the defendant[10] that on that date the defendant, Marilyn and Leonard Johnson, and Daphnis were being tried upon perjury indictments in Superior Court in Hampden County.[11]

On June 27, 1983, while the instant appeal was pending decision, the defendant's counsel filed a motion to enlarge the record on appeal to include a development at the now concluded perjury trial which put in question the assertions of record by Graham and Mr. Rigali that no promises or inducements had been given. Graham, although under indictment, had not been joined as a defendant in the perjury trial. Rather she had testified

---

[8] The Commonwealth had been ordered to disclose promises, rewards, or inducements and had made no response of record.

[9] Reading the many pages of the trial transcript is a saddening experience. There is seemingly endless, repetitious, and often aimless interrogation accompanied by recriminations between counsel. There is massive confusion. It is hard to make sequential sense of Graham's testimony.

[10] Counsel on appeal had not served in the prior proceedings and was not associated with the perjury trial.

[11] It may be noted that testimony by the two Johnsons and Daphnis given at the defendant's trial could now be charged as false, in addition to the charges of falsity related to the testimony given at the probation revocation hearings.

for the Commonwealth in some conformance with the testimony she gave previously at the defendant's trial. The Commonwealth, responding to the question of promises or inducements, had filed a statement by assistant district attorney George S. Abdala, who tried the perjury case, which affirmed that Mr. Rigali had in effect agreed to leniency for Graham on her District Court charges if she would give a statement and testify for the Commonwealth; and "[t]his was done."[12]

The Commonwealth by Mr. William T. Walsh, Jr., the assistant district attorney who argued the appeal, answered the motion to enlarge the record by repudiating Mr. Abdala's statement. In explanation, the Commonwealth said that the statement had been prepared in haste; that Mr. Abdala had spoken only to Mr. Winniman, Graham's counsel; and that Mr. Rigali, when later reached, contradicted Mr. Winniman.

Taking note of the assertions supporting and opposing the motion, this court by order of September 12, 1983, in aid of its consideration of the appeal, directed a judge of the Superior Court to conduct a hearing into the question of promises or inducements to Graham and any actions by the Commonwealth consequent thereon. Such a hearing was conducted in Superior Court in Hampden County on December 19, 1983, by a judge not previously connected with the relevant proceedings. It was

---

[12] The statement was as follows:

"PROMISES OR INDUCEMENTS OFFERED TO A WITNESS Now comes the Commonwealth in the above entitled matter and says the witness Paulette Graham had matters pending in District Court. Assistant District Attorney Henry Rigali agreed to continue the cases without a finding if the witness Paulette Graham would give a statement relating to perjury and would make herself available to testify for the Commonwealth. This was done.

THE COMMONWEALTH
By George S. Abdala
George S. Abdala
Assistant District Attorney."

It will be observed that this statement does not describe accurately (except in respect to the District Court charges of the murder threat and witness intimidation) what happened in that court, but the effect over-all for Graham was substantially the same.

not until May 8, 1985, that the judge returned his findings and a transcript.[13]

Messrs. Winniman and Rigali testified at the December, 1983, hearing. Mr. Winniman understood from Mr. Rigali that he had agreed to use his good offices for Graham on her pending charges (which presumably meant assuring that she did not go to jail) in consideration of her giving a statement. However, Mr. Winniman said his main interest or concern was to get the charges disposed of very promptly, without continuance; he was serving without compensation and did not want to waste his time. He did not consider the charges to be serious, but if they were heard immediately his client Graham would be appearing before a judge whom he regarded as lenient. Mr. Winniman was confronted with the fact that he had attended the defendant's trial in March, 1982 (see note 5, *supra*) where Graham testified that she had received no promises. Why did he not demur? He said he had no recollection of his appearance at that trial.

Mr. Rigali testified that, while he may early have suggested to the probation authorities that they review Graham's record, in the end he did not influence them to refrain from seeking revocation of her probation. He had made no treaty with Mr. Winniman or Graham to use his influence with respect to the District Court charges,[14] and he so informed Mr. Abdala when, after the conclusion of the perjury trial, he learned of Mr. Abdala's statement to the court. Mr. Rigali's testimony concluded with his description of a conversation with Mr. Winniman postdating that trial. An inference would be warranted that Mr. Rigali had been counting on a certain sophistication on the part of Mr. Winniman that would save Rigali from any

---

[13] Thereafter this court invited supplemental briefs and on August 1, 1985, heard renewed argument on the appeal.

[14] Mr. Rigali thought the statement Graham gave him on January 27, 1982, began with questions to Graham about whether she had received a promise or inducement, but in fact the transcript contains no such questions.

reproach of having made a promise although implicitly he had conveyed the substance of one.[15]

In his findings the judge favored Mr. Rigali over Mr. Winniman and found, that no promise had been given. He also found, however, that the "quid pro quo" for disposal of the District Court cases on January 27, 1982 (without continuance), was that Graham would give a statement to Mr. Rigali. We add that this has to be seen in the light of the advantage Mr. Winniman saw in appearing for disposition before the particular District Court judge.[16]

---

[15] The conversation as described by Mr. Rigali ran thus:

I went and talked to Mr. Winniman and I asked him what the story was, and said to him there were no promises of any kind either in Superior Court or in the District Court, and what was the story.

And he said that it was his impression that there was, that he felt that there was. And I had a very — well, it wasn't a heated discussion, it was certainly brisk and to the point — that what his impressions were were different than what I had stated to him, and that it was, what I thought to be as an attorney, and error for him to say, well, my impression was so and so and to misconstrue that, and I said that — to be more direct Winniman said to me that he expected his client would get favorable treatment at some point along the line, and I said to him that that, you know, he was certainly free to do that, and so forth, but that I had never at any time said to him that she was going to get favorable treatment in any way.

Obviously, you know, if she had cooperated with the government, that cooperation would be public record, either Doug Winniman or myself or Probation Department, whoever was making a pitch for her, would bring that to the attention of the Court, but there was never any express or indirect or implied agreements between Winniman and myself.

At which point Mr. Winniman said you can call that what you want, I call that an agreement. And I said, no, no, I said, Doug, listen you are not over there in Superior Court that much, and you know that is not an agreement, that is an inference, and that is wrong, and I think that is going to cause a lot of problems here. And he said, well, we'll see what happens, and so forth.

So, that was the thrust of the conversation I had with Winniman, and it was an unfortunate one, and, unfortunately, it seemed like everything became polarized. His memory was definite and mine was definitely on the other side. So, that remains a fact issue.

That was the substance of the conversation I had with Winniman.

[16] Graham was not called to the December, 1983, hearing by either side, nor was the omission explained. The defense might be content not to seek to embroider Graham's assertion at the perjury trial that a promise was made. Less clear is it why the Commonwealth, under attack for lack of full

The findings state that it is not clear that Mr. Winniman conveyed to Graham the agreement he claimed he and Mr. Rigali had made. However, when Graham appeared on the stand for the last time, that is, as a witness for the Commonwealth at the perjury trial, she was quite clear that she was the beneficiary of a promise regarding the District Court charges, in return for which she had given her statement and undertaken to assist the Commonwealth. Graham testified to this effect on her direct examination by Mr. Abdala himself and again on cross-examination[17] that she now believed, or

candor about Graham's motivation, did not produce Graham so that the trier might form his own impression whether or not favorable to the Commonwealth.

[17] She testified thus:

[On direct] Q. And in March of 1982, when you testified for the Commonwealth, was that after you had been shown consideration on the charges on the credit card and on the larceny under?
A. Yes
. . . .

[On cross] Q. Now, in your statement in the District Attorney's Office, on page 57, on January the 27th, and again that was after you decided that you were going to go to the District Attorney and in exchange for some promises that were going to be given to you, you were going to testify, isn't that true?
A. Yes, it is.
Q. And you made a deal with the District Attorney's Office? In exchange for your testimony certain cases would be dropped, is that true?
I'm sorry, certain cases would be disposed of in a favorable manner to you, is that correct?
A. That Mr. Rigali would make a recommendation, yes.
Q. The recommendation would be a disposition that you wouldn't have to go to jail for, isn't that correct?
A. Yes, it is.
. . . .

Q. During the time that you were under a charge and went to the District Attorney's Office and during that time you were under a charge of larceny over a hundred dollars?
A. No.
Q. I'm sorry, under a hundred dollars?
A. Yes.
Q. And also under a charge of possession of stolen credit cards?
A. Yes.
Q. And those were the two charges that you made a deal with the DA's Office?

professed to believe, that she had had a "deal." [18] Mr. Winniman, be it noted, was in attendance at the perjury trial (to advise Graham about self-incrimination, cf. note 5, *supra*). It is convenient to state at this point that the cases against the defendant and the others tried for conspiracy to suborn perjury were dismissed upon a finding of not guilty by the judge (one not involved in the prior proceedings). Graham has not been tried.

2. *Recapitulation.* (a) By procuring the perjury indictments just before the commencement of the defendant's trial on the assault, the prosecution put maximum pressure on the defendant's prospective witnesses to forgo testifying for him. This suggests that the prosecution should in fairness have put off applying for the perjury indictments until after the assault trial. However, the point need not be pressed, especially since the witnesses in fact persisted in appearing and testifying at the defendant's trial as they had done at the probation revocation hearing (and were rewarded for this by having that testimony also charged as perjurious).

Where the prosecution was at fault was in seeking to discredit the witnesses' testimony at the assault trial through the use of the outstanding perjury indictments. The purpose was· accomplished through Graham as rebuttal witness.

We shall assume that the trial judge exercised an irreversible, even if dubious, discretion when he overruled the defense objection of surprise when Graham, unlisted as a prospective witness for the Commonwealth, was abruptly put on the stand. The prosecution had her admit that she was then under indict-

---

A. Yes, it was.

Q. And the deal was if you testified, there would be a recommendation of a favorable disposition of those cases, is that right?

A. Yes, it is.

Q. And in fact, those cases went to Court and no finding was made and they were dismissed, isn't that true?

A. Yes, it is.

[18] What matters here is Graham's motivation. Thus in the last analysis the critical point is whether Graham believed she had a deal, not whether Mr. Winniman conveyed to her that she had one. See *Commonwealth* v. *Kane*, 19 Mass. App. Ct. 129, 141-142 (1984).

ment for perjury. This had the look of a common practice whereby a witness may be led on direct examination to admit to past criminal convictions which would anyway be brought out on his or her cross-examination.[19] The bland look here was deceptive. Nearly inevitably the jury would infer that the witnesses Leonard and Marilyn Johnson and Carol Daphnis (and the defendant also) were under similar indictment, and in this respect differed from Graham only in that they persisted in their perjury. Another way of putting the matter is to say that the prosecution succeeded through indirection in impeaching the witnesses by means of the pending indictments when, according to statute, G. L. c. 233, § 21, impeachment would require proof of prior criminal convictions. (At the same time the defendant was being "impeached" because he was evidently in the same boat with the witnesses.)[20] We hesitate to say that trial counsel was inefficient in failing to foresee on the spot the misuse of the indictments and to attempt to guard against it. That the defendant was damaged seems plain.[21]

(b) Next we have the peculiar fact that the defense did not impeach Graham, a principal witness for the Commonwealth, by means of her previous criminal convictions in New York, the basis of her long-term probation here. Apparently the defense knew she had such a record, but counsel was nonplussed what to do when, time being very short, the prosecution, with the trial judge seemingly acquiescent, insisted that authenticated records be produced. Defense counsel was inefficient in not having procured the records, and in failing to make any

---

[19] See *Commonwealth* v. *Cadwell*, 374 Mass. 308, 311-313 (1978).

[20] Analogy is suggested to the rule that one witness is not to accuse another witness of perjury. See *Commonwealth* v. *Ward*, 15 Mass. App. Ct. 400, 401-402 (1983); *Commonwealth* v. *Long*, 17 Mass. App. Ct. 707, 707-710 (1984); *Commonwealth* v. *Morris*, 20 Mass. App. Ct. 114, 119 (1985).

[21] The judge's usual instruction about an indictment not being probative of guilt was not, we think, sufficient in the circumstances to avert the damage. There was language in the instructions, moreover, that might have invited the jury to consider "anything" which in their opinion bore on credibility.

The examination of Graham could have been conducted without reference to her indictment.

attempt to seek admissions from Graham or to require the prosecution to disclose the convictions if it knew them. At the same time, it is not easy to condone the prosecution's barring important information by insisting on a punctilio of form.

(c) With respect to "promises or inducements," defense counsel may simply have accepted the prosecution's failure to disclose any in response to the discovery question as representing a truthful negative, and as absolving the defense of any further duty of inquiry. At any rate, the jury heard nothing about the preservation of Graham's probationary status or about the District Court charges and their disposition — a history which bore on Graham's motivation and the credit to be given her testimony. Again we have to question counsel's efficiency, and it is certain the jury were deprived of evidence whose strength they should have been permitted to assess.

(d) Was a promise in fact made or an inducement held out to Graham? Our remand for a hearing and findings was intended to give us some view of the answer. The record made is extraordinary. We have the picture of one prosecutor representing to the court that a promise was made (he knew at the time that Graham was about to testify to the same effect), with another prosecutor, who had worked out of the same office, denying that there was such a transaction. Add to this tableau an attorney for Graham who swears that a promise was made: he professes no memory of his attendance at the assault trial where Graham denied any promise; later he attended the perjury trial where Graham reversed herself.

The judge's findings favor Mr. Rigali over Mr. Winniman about the making of a promise. But, first, the judge did not explain whether in negating a promise he meant to cover an implicit promise. Second, an exchange between Mr. Rigali and Mr. Winniman, as described by the former (see n.15), suggests that there was the substance of a promise, even if words of promise were not used;[22] and there was circumstantial

---

[22] Compare "A promise may be lacking, and yet the whole instrument may be 'instinct with an obligation,' imperfectly expressed . . . . If that is so, there is a contract." Cardozo, J., in *Wood* v. *Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 91 (1917).

evidence in the same direction (see, e.g., note 4, *supra*), not least of which consisted of the actual outcome of the District Court charges. Third, while finding against a "promise," the judge did find a reasonable facsimile in the form of a "quid pro quo": Graham's statement in consideration of prompt disposition before a judge conceived by Graham's attorney to be lenient. Even on the last, narrowest view of the transaction, we think the prosecution was bound to make fair disclosure of it, and could not justify letting the record stand with Graham's blanket testimony at the assault trial.

(e) In the face of the repeated strictures of the Supreme Judicial Court, it is profoundly disturbing to find an experienced prosecutor vouching in the name of the Commonwealth for the credit of a prosecution witness, as he did at the assault trial. And, knowing what he did about the witness Graham, it was a peculiarly trumpery act on his part to suggest that she was testifying simply to ease her conscience. We do not accept that the prejudice engendered was cancelled by the judge's remarks that what counsel said was not evidence.

3. *Conclusion.* Putting particular factitious differences to one side, the present case bears great resemblance to *Commonwealth* v. *Collins,* 386 Mass. 1, involving the same district attorney's office and decided on April 29, 1982, some two months after the assault trial herein. In *Collins* we see a cumulation of prosecutorial abuses: the nondisclosure of exculpatory material in the form of understandings between prosecutor and witness, the offering of testimony by the witness on that subject matter known by the prosecutor to be misleading, and, finally, a seriously tendentious closing argument. In the present case these elements reappear. And, as in *Collins,* there is reason to think that, had the prosecutor not offended, the result might have been different: the result of the subsequent perjury trial is suggestive.[23] Mixed into the misconduct is the suspect

---

[23] In *Collins* the court mentions three situations where a failure to disclose material exculpatory evidence warrants a new trial. The first two are of interest here (386 Mass. at 9): "First, where, either through misfeasance or nonfeasance by the prosecutor, false testimony is introduced concerning an arrangement between the witness and the prosecutor, a strict standard of materiality is applied. A conviction will be set aside if there is 'any reason-

use at the assault trial of the perjury indictments, and the waffling behavior of members of the district attorney's office. Other counsel do not fare well. Counsel for Graham has a critical lapse of memory. Counsel for the defendant at the assault trial appears inefficient in meeting Graham's testimony, and in other ways, to the point of failing the *Saferian* test.[24] That trial is generally unsatisfactory.

The faults mentioned seem to us to call, as matter of law, for a new trial at which a jury may hear the whole story.

*Judgments reversed.*

*Verdicts set aside.*

---

able likelihood that the false testimony could have affected the judgment of the jury.' [citing *Commonwealth* v. *Gilday*, 382 Mass. 166, 177 (1980), quoting from *United States* v. *Agurs*, 427 U.S. 97, 103 (1976).]

"In addition, when a defendant has made a specific and relevant request for exculpatory evidence, the prosecutor's failure to respond to such a request will be excused only if 'the error did not influence the jury, or had but very slight effect.' *Gilday, supra* at 178, quoting from *Kotteakos* v. *United States*, 328 U.S. 750, 764 (1946)."

[24] *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974) ("behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer").