COMMONWEALTH *vs.* MARK SCHAND.

Hampden. May 1, 1995. - July 18, 1995.

Present: LIACOS, C.J., WILKINS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Practice, Criminal,* New trial, Disclosure of evidence, Witness, Instructions to jury, Reasonable doubt, Assistance of counsel, Capital case. *Evidence,* Exculpatory, Relevancy and materiality, Police report, Inference, Identification. *Constitutional Law,* Confrontation of witnesses, Assistance of counsel. *Witness,* Cross-examination. *Joint Enterprise. Identification. Homicide.*

At a hearing on a criminal defendant's motion for a new trial, ample evidence supported the judge's findings that certain police reports, which the defendant claimed were improperly withheld, either contained no material exculpatory information or had been disclosed to trial counsel or the information contained therein was known to counsel: the judge correctly denied the motion. [787-791]

At a hearing on a criminal defendant's motion for new trial, there was sufficient evidence to support the judge's finding that the defendant had failed to prove that the prosecutor had offered any promises, rewards or inducements to a certain witness in the context of a plea bargain or that the prosecutor had offered any inducements to another witness in exchange for his testimony. [791-793]

At a murder trial there was sufficient evidence to warrant the judge's instructions to the jury on joint venture to commit armed robbery and the judge's instructions were correct in every aspect on armed robbery, felony-murder based on armed robbery, and joint venture. [793-794]

At the trial of a murder indictment, the judge's instructions on reasonable doubt could not reasonably have misled the jury as to the Commonwealth's burden of proof [794-795], nor could the judge's instruction on inferences have led the jury to engage in unwarranted speculation [795].

At a murder trial, evidence from two police detectives corroborating witnesses' extra judicial identifications of the defendant by verifying the photograph selected by each witness and testifying about the statements made by the witness when selecting the defendant's photograph was properly admitted, where each identifying witness testified that he had made an out-of-court identification of the defendant and the detectives'

testimony with respect to the identifications did not go significantly beyond the trial testimony of the witnesses. [795-796]

There was no merit to a criminal defendant's claim that his trial counsel did not furnish effective assistance of counsel. [796-797]

There was no basis for this court to grant relief pursuant to G. L. c. 278, § 33E, to a defendant convicted of first degree murder by reason of felony-murder, armed robbery, and assault with intent to kill. [797]

INDICTMENTS found and returned in the Superior Court Department on December 18, 1986.

A motion for a new trial, filed on September 13, 1991, was heard by *John F. Murphy, Jr.,* J.

*John M. Thompson* (*Linda J. Thompson* with him) for the defendant.

*R. Michael Cassidy,* Assistant Attorney General (*Pamela L. Hunt,* Assistant Attorney General, with him) for the Commonwealth.

GREANEY, J. The defendant, Mark Schand, was found guilty of murder in the first degree by reason of felony-murder, armed robbery, and assault with intent to kill. Represented by new counsel on appeal, he argues that the trial judge erred in denying his motion for a new trial, which was based on the allegation that the prosecution had failed to disclose exculpatory information contained in certain police reports and had also failed to disclose promises, rewards, and inducements offered to two Commonwealth witnesses. We reject these arguments. The defendant also argues that a new trial is required because of alleged errors with respect to the jury instructions on joint venture, reasonable doubt, and inferences, and in the admission of corroborative identification testimony of police officers. The defendant maintains as well that his trial counsel furnished him with ineffective assistance of counsel. We discern no basis for a new trial in any of these arguments. Finally, we conclude that there is no basis to exercise the authority granted to us under G. L. c. 278, § 33E (1992 ed.). Accordingly, we affirm the order denying the defendant's motion for a new trial and the judgments of conviction.

Based on the evidence in the Commonwealth's case, the jury could have found the following. On the night of September 2, 1986, the defendant, who was from Hartford, Connecticut, together with three or four other Hartford men, came to Springfield and went to the area of the After Five Lounge. Outside the lounge, shortly before 11:25 P.M., the group of Hartford men approached Charles Stokes and sought to purchase cocaine. Charles and his brother, David Stokes, who were standing with several other men, showed the Hartford men some cocaine. The mood became confrontational. As the cocaine was being passed around, Charles objected and asked them to "give me [back] my shit . . . ." Someone in the Hartford group pulled a gold chain off David Stokes's neck, and he began to run toward the After Five Lounge. Charles grabbed for his cocaine and, hearing a gun shot, began running toward the side door of the lounge. He was hampered by his untied shoelaces, and fell several times. While he was trying to escape, Charles heard more shots. As he was running past the victim, Victoria Seymour, he heard her exclaim, "I've been shot." He again fell in the street. Before he could get up, a man stood over him with a handgun and told him, "Kick the shit in." Charles turned over the cocaine he was holding and all the money on his person. The robber, and others involved in the melee, fled on foot. The victim died from her gunshot wound early the next day. Anthony Cook was also shot during the incident.

At trial, Charles identified the defendant as one member of the Hartford group who had asked about the purchase of cocaine and as the man who had robbed him at gunpoint. In addition to Charles, five other eyewitnesses identified the defendant as the gunman who had robbed Charles. One of these identified the defendant as the man who had shot the victim, although the basis for this identification was not clear. Two Springfield area youths also identified the defendant as a member of a group of persons they had seen earlier at a Pizza King restaurant which was near the lounge. One

of the youths saw members of the group leave the restaurant in a van with a Connecticut registration plate.

The defendant was arrested in Hartford about eight weeks after the incident. He told Springfield police after his arrest that he had not been in Springfield on September 2, 1986, and that he had gone to Springfield only once in his lifetime. To counter these assertions, and to show consciousness of guilt, the prosecution presented testimony that the defendant had been seen in Springfield frequently at various events and places in the months immediately preceding the homicide. The defendant did not testify at the trial. He presented evidence, however, from a dentist who testified that he had performed a root-canal type procedure on one of the defendant's back teeth late in the morning of September 2, 1986, and from the mother of the defendant's child and several of her relatives and acquaintances, who testified that the defendant had been in their presence in Hartford during the day and night of September 2, 1986.

1. *Motion for a New Trial.*

The defendant's motion for a new trial raised two principal points. First, he argued that, despite the defendant's general request for exculpatory evidence and for evidence concerning out-of-court identification procedures, police department reports pertaining to the issue of identification had not been disclosed. In one instance, it was argued, a report had been tampered with to conceal the existence of a second page containing exculpatory evidence. Second, he contended that the prosecution had failed to reveal other exculpatory evidence in the form of promises, rewards, and inducements offered to two identification witnesses, Charles Stokes and Michael Bernard, in connection with criminal charges pending against them.

The trial judge conducted a lengthy and thorough evidentiary hearing on the motion for a new trial. Testimony was taken from seventeen witnesses, including the prosecutor, the defendant's trial counsel, counsel for Charles Stokes and Michael Bernard, (both men had the same lawyer for their respective criminal proceedings), and police officers. The

judge also conducted a careful review of the record, including the transcript of a hearing on the motion to suppress out-of-court identification evidence, and he was aided in his analysis of the merits of the motion for a new trial by his familiarity with the history of the case and his personal observation of the evidence as it had unfolded at the trial. The judge made thorough and extensive findings of fact.

The judge's findings of fact are to be accepted if supported by the evidence, and he is the final arbiter of matters of credibility. His disposition of the motion is governed by the following general standards stated in *Commonwealth* v. *Moore*, 408 Mass. 117, 125 (1990): "A motion for new trial is addressed to the sound discretion of the judge, *Commonwealth* v. *Smith*, 381 Mass. 141, 142 (1980), and the judge's disposition of the motion will not be reversed unless it is manifestly unjust, *Commonwealth* v. *Little*, 384 Mass. 262, 269 (1981), [rev'd on other grounds, *Commonwealth* v. *Santos*, 402 Mass. 775, 788 (1988)]; *Commonwealth* v. *Leavitt*, 21 Mass. App. Ct. 84, 86 (1985), or unless the trial was infected with prejudicial constitutional error. *Commonwealth* v. *Stewart*, 383 Mass. 253, 257 (1981). Reversal for abuse of discretion is particularly rare where the judge acting on the motion was also the trial judge. *Commonwealth* v. *Leavitt*, *supra* at 85. *Commonwealth* v. *Gordon*, 13 Mass. App. Ct. 1085 (1982)."

a. *Disclosure of police reports.* The defendant argues that he is entitled to a new trial because the prosecution failed, despite a specific request, to turn over exculpatory information in the form of police reports related to out-of-court identification procedures. To prevail on this point, the defendant must establish that the evidence existed, that it tended to exculpate him, and that the prosecution failed to deliver the information. See *Commonwealth* v. *Adrey*, 376 Mass. 747, 753 (1978), and cases cited. The defendant also must establish that the nondisclosed evidence was "material." *Id.* When, as here, specifically requested evidence is at issue, it will be considered material if the defendant "demonstrate[s] that a substantial basis exists for claiming prejudice from the

nondisclosure." *Commonwealth* v. *Tucceri*, 412 Mass. 401, 412 (1992).[1]

Under the standards expressed above, the trial judge properly decided that no basis had been shown to require a new trial. As the Commonwealth concedes, this case does not serve as "a model of discovery procedure." The prosecutor did not keep a specific record of what had been produced in response to motions by the defendant's trial counsel, nor did that counsel keep a record of what he had received. Although the defendant's trial counsel testified that he had not received certain material, the judge noted that counsel was relying on his memory of a file that had been out of his possession for more than four years. While it was difficult to conclude with certainty, five years after the trial, what reports had been turned over to the defendant's trial counsel, the hearing on the defendant's motion to suppress evidence of out-of-court identifications (held during three days in July, 1987, about four months prior to trial) had provided to the defendant a thorough account of the police investigation. On the basis of the transcript of this hearing, the testimony at

---

[1]We reject the defendant's contention (made for the first time on appeal) that art. 12 of the Declaration of Rights to the Massachusetts Constitution should be interpreted to impose on the Commonwealth the burden of persuasion on the issue of prejudice where exculpatory evidence has not been disclosed. In support of this contention, the defendant relies on a recent decision of the Supreme Court of New Hampshire, *State* v. *Laurie*, 139 N.H. 325 (1995), interpreting a provision of the New Hampshire Constitution.

In *Commonwealth* v. *Tucceri*, 412 Mass. 401, 409 (1992), we noted that we have, as matter of State common law, respected the discretion of a judge, who was also the trial judge, "to award a new trial, even if a new trial is not constitutionally required." Also as matter of common law, we have declined to follow the United States Supreme Court's decision in *United States* v. *Bagley*, 473 U.S. 667 (1985), see *Tucceri, supra* at 408; *Commonwealth* v. *Gallarelli*, 399 Mass. 17, 21 n.5 (1987), which had the effect of increasing the burden of proof on the defendant who has specifically requested the production of exculpatory evidence. Nonetheless, we have continued to place with the defendant "the burden of showing prejudice warranting or requiring a new trial order." *Commonwealth* v. *Tucceri, supra* at 404 n.2. We decline to alter the standards governing a defendant's motion for a new trial based on the prosecution's failure to produce exculpatory evidence.

the hearing on the motion for a new trial, and the testimony at the trial, the judge found that most of the reports either contained no material exculpatory information,[2] had been disclosed to the defendant's trial counsel,[3] or that counsel was aware of the contents of the reports or the information therein. There can be no prejudice when the contents of a

[2]One report (the Scammons-Assad report of September 17, 1986) was found to contain no exculpatory material. The officers reported they had gone to Hartford to pick up photographs for an array; the defendant's photograph was not among them. Detective Scammons testified to the trip at the motion to suppress hearing.

Three brief reports forwarded to Springfield police by the Hartford police department also were found to have no material exculpatory value. There is no copy of these documents in the defendant's appendix. They apparently implicated one Randy Weaver in the incident at the After Five Lounge. The defendant's trial counsel knew that Weaver was a suspect who had been placed at the scene, and that he was known to be an associate of the defendant. His photograph had been shown to eyewitnesses of the incident, none of whom had identified him as the gunman standing over Charles Stokes. The defendant would not have been exculpated by information tending, at best, only to identify another member of the group from Hartford.

[3]The judge found that the defendant's trial counsel had received a copy of the relevant portions of Detective Scammons's personal notebook. During the hearing on the motion to suppress, the judge presiding over the motion proceeding ordered the prosecutor to copy various pages of Scammons's notebook. Five to ten pages were copied. During the motion to suppress, defendant's trial counsel questioned Scammons on the basis of the notebook. The judge's finding that the notebook had been turned over was supported by the evidence.

The judge also found that the September 3, 1986, Cheetham-Dean report of the officers' interview with Anthony Cooke on the night of the murder was turned over to the defendant's trial counsel. The report was in the prosecutor's notebook. Copies of police reports in this notebook were turned over to the defense. Cooke testified at the motion to suppress that he had spoken with police officers at the hospital on September 3. The defendant's trial counsel indicated that he consistently asked for police reports he did not have, but he made no request for a report of this conversation. The judge properly could infer from defense counsel's failure to inquire about a report that he already possessed it.

Finally, the trial judge found that the McNulty-Fleury report of September 18, 1986, was furnished to the defendant. The defendant's trial counsel testified at the hearing on the motion for a new trial that he recalled the contents of the report.

police report are known to the defense. See *Commonwealth v. Vieira*, 401 Mass. 828, 838 (1988).

The record demonstrates that nothing in a sixth report was exculpatory.[4] The seventh report had not been disclosed to trial counsel, but its substance was generally known, and the one fact which was unknown and which could arguably be considered exculpatory, is not sufficient to grant a new trial.[5] Finally, the judge rejected the defendant's allegation that the prosecution and police had conspired to withhold information from the defendant's trial counsel by altering a police report, concluding that the defendant's trial counsel knew the con-

---

[4]This is the September 18, 1986, Reid-Scammons report. The trial judge made no finding as to this report, which describes the showing of an array of the photographs the officers had picked up in Hartford to two young men, who, shortly before the shooting, had seen a group of young black men from Connecticut in a restaurant close to the scene of the shooting. There would have been ample basis for finding that the report was turned over to the defendant. Officer Reid testified at the hearing on the motion to suppress that he prepared daily activity reports summarizing each of the interviews he conducted in connection with the investigation. These had not been turned over by the police to the prosecution. At the close of the hearing, the officer was instructed to review the police file and produce daily activity reports related to the case. There is no reason to believe that defense counsel failed to obtain the material promised to him.

Even if the content of the report was not disclosed, a new trial would not be warranted. The defendant's photograph was not among those shown to the witnesses on September 18. Neither boy witnessed the shooting; it was not thought they could identify Charles Stokes's assailant. Neither boy identified anyone with certainty; each selected certain photographs as similar in appearance to a member of the group at the restaurant on September 2, 1986. This would not preclude the defendant's having been a member of the group.

[5]This is the September 23, 1986, McNulty-Fleury report. The defendant was aware that the witness mentioned in this report had selected photographs of individuals who looked like those he had seen at the After Five Lounge, including the defendant and others. The defendant was not aware, however, that the witness had no recollection of seeing anyone with "corn-rolls" (i.e., cornrows, a distinctive braided hairstyle). The defendant's hair was braided in cornrows. At trial, this witness was by far the weakest of the Commonwealth's identification witnesses, and the defendant's trial counsel effectively impeached his testimony. The defendant would not have been significantly aided by a modest addition to the fund of impeachment information.

tents of the report and of its existence.[6] As has been set out
in the margin, there was ample evidence to support the
judge's findings.[7]

b. *Promises, rewards, and inducements.* The defendant
claims that the prosecutor had informal understandings with
Charles Stokes and Michael Bernard regarding the disposi-
tion of criminal charges pending against them at the time of
trial which should have been disclosed to him but were not.[8]
See *Giglio* v. *United States*, 405 U.S. 150 (1972).

---

[6]The allegation concerned the September 24, 1986, Scammons-Reid re-
port. In 1991, a copy of this report, with white tape over notations indicat-
ing the existence of a second page, was discovered in the Springfield police
file. The prosecutor's trial file contained a copy of the unaltered, two-page
report. It was suggested that the prosecutor had deliberately concealed
from the defendant's trial counsel the existence of the report's second
page, which summarized a police interview with Charles Stokes. As the
trial judge noted, Stokes was questioned by the prosecutor about this inter-
view before the grand jury and at the hearing on the motion to suppress.
At trial, Detective Scammons was questioned by the prosecution about the
interview. Scammons testified he had "made a note" on the meeting.
There was no deliberate attempt to suppress information about this meet-
ing. If the defendant's trial counsel lacked a copy of the second page of the
report (which seems unlikely, since he testified that he asked for copies of
any written reports that had not been provided to him), he was aware of
its contents. The defendant's trial counsel used Stokes's failure to identify
the defendant prior to March, 1987, for impeachment purposes.

[7]We are unable to discern the factual basis for the argument that the
prosecutor deliberately attempted to conceal information that one of the
members of the group from Hartford may have had bad or decaying teeth.
During the trial, *counsel for the defendant* introduced a copy of a police
report with a handwritten notation "one with bad/decaying teeth." Police
officers involved in the investigation were unable to recall the source or
relevance of the notation, but it was open to the defendant's trial counsel,
who had this report prior to trial, to investigate whether the comment re-
lated to the report on which it appeared. Viewed in context, it was far
from clear that two brief references to "bad teeth" were intended to de-
scribe a feature of the defendant. Even if the references were so intended,
they could be viewed as accurate. The defendant had a gold front tooth.
The defendant's trial counsel apparently made the reasonable decision to
pursue other means of impeaching the witnesses' identifications of the
defendant.

[8]Although the defendant argues that promises, rewards, or inducements
were made by the prosecution to "the Stokes brothers," he appears to have
abandoned any claim on the issue with respect to David Stokes. The judge
found that there were no undisclosed promises to David.

At the time of trial, Charles Stokes was facing charges of armed robbery and assault by means of a dangerous weapon. After the trial, Charles entered guilty pleas on the charges and was sentenced, in accordance with the prosecutor's recommendation, to a suspended (for five years) sentence of from eighteen to twenty years at the Massachusetts Correctional Institution, at Cedar Junction. (Charles violated his probation approximately one month after this sentence was imposed, and he is now serving the sentence.) At the time of trial, Michael Bernard was facing charges of assault and battery by means of a dangerous weapon, shoplifting, and a variety of narcotics offenses. The charges were subsequently disposed of by changes of pleas and a sentence of probation of three years.

A defendant has a constitutional right to cross-examine "to inquire whether [any key] witness expects more favorable treatment from the government in return for his testimony." *Commonwealth* v. *Michel*, 367 Mass. 454, 459 (1975), *S.C.*, 381 Mass. 447, (1980). An "inducement" consists of any statement which "reasonably implies that the government . . . is likely to confer or withhold future advantages . . . depending on [the] witness'[s] cooperation." *United States* v. *Buendo*, 701 F. Supp. 937, 942 (D. Mass. 1988), aff'd sub nom. *United States* v. *Penta*, 923 F.2d 839 (1st Cir. 1990).

There was sufficient evidence to support the judge's finding that the defendant had failed to prove that any promises, rewards, or inducements had been offered to Charles Stokes before his trial. While both Charles and his counsel had sought a promise of leniency from the prosecutor on Charles's pending charges, the prosecutor indicated only that he would be "fair" with Charles. Charles's counsel also testified at the hearing on the motion for a new trial that no promises had been made to his client before this trial even though both counsel and Charles had, according to the judge, "hounded" the prosecutor to obtain "a deal for Charles Stokes." A commitment to be "fair" is not a promise of favorable treatment. A prosecutor has a general obligation to be fair in dealings with every witness and defendant. An oth-

erwise arm's-length relationship in the negotiation of a plea
bargain cannot be construed to involve secret inducements
simply because the plea bargain is reached under a commit-
ment of fair treatment. See *United States* v. *White*, 861 F.2d
994, 997 (6th Cir. 1988) ("where the government's conversa-
tions with a plea bargainer do not amount to a promise of
treatment beyond that extended to any other person, no
promise cognizable under *Brady* [v. *Maryland*, 373 U.S. 83
(1963)] has been made . . . and thus there is no duty to dis-
close such discussions to the defense").[9]

There was also adequate support for the judge's finding
that the defendant had failed to prove that the prosecutor
had offered any inducements to Michael Bernard in ex-
change for his trial testimony. Bernard's counsel at the time
(who was also Charles's counsel) could not recall with any
certainty whether he and the prosecutor had agreed to Ber-
nard's probationary sentence before the defendant's trial.
The prosecutor testified that he had not made Bernard any
promises about the disposition of the charges prior to Ber-
nard's testimony at the defendant's trial. The record thus left
the defendant's claim of undisclosed governmental influence
over Bernard totally to surmise.

2. *Jury Instructions.*

a. *Joint venture.* We reject the defendant's contentions
that there was insufficient evidence to warrant jury instruc-
tions on joint venture to commit armed robbery and that the
instructions given were erroneous. "The test [for participa-
tion in a joint venture] is whether [the] defendant was (1)
present at the scene of the crime, (2) with knowledge that

---

[9]The defendant's reliance on *Commonwealth* v. *Collins*, 386 Mass. 1
(1982), and *Commonwealth* v. *Johnson*, 21 Mass. App. Ct. 28 (1985), as
paralleling this case, is misplaced. In the *Collins* case, the prosecutor made
an express promise to a cooperating witness to reduce a pending first de-
gree murder charge to a charge of murder in the second degree. See *id.* at
6. In the *Johnson* case, the prosecutor, at a minimum, made a promise to
bring the witness's cooperation to the attention of the court sentencing him
on a pending District Court complaint. See *id.* at 36 & n.15. In this case,
by contrast, there was no promise to do anything for Charles Stokes, not
even to bring his cooperation to the attention of the sentencing judge.

another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth* v. *Bianco*, 388 Mass. 358, 366, *S.C.*, 390 Mass. 254 (1983). The defendant was with a group of persons from Hartford. It could be inferred from the conduct of the members of this group, and particularly from the refusal to return to Charles Stokes the package of cocaine, that the group intended to rob the Springfield men. The jury could find that the defendant's pursuit of Charles was for the purpose of completing the robbery commenced when the Hartford group refused to return the narcotics to Charles Stokes. The judge's instructions (which were not objected to by defendant's trial counsel) were correct in every respect on armed robbery, felony-murder based on armed robbery, and joint venture, including, with respect to the latter issue, instructions on the need for active participation by the defendant in the venture and the need for him to share with others the specific intent to commit armed robbery.

b. *Reasonable doubt.* The instructions on reasonable doubt were not objected to at trial. The language now complained of[10] (drawn apparently from *Commonwealth* v. *Seay*, 376 Mass. 735, 745-746 n.7 [1978]), could not reasonably have misled the jury as to the Commonwealth's burden of proof. Following this statement, the judge charged the jury in language which substantially tracked *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850), and made the jury aware that each element of each crime had to be proved beyond a reasonable doubt in language which properly conveyed the meaning of that concept. Further, viewing the instructions as a whole, see *Commonwealth* v. *Gagliardi*, 418 Mass. 562, 572 (1994), cert. denied, 115 S. Ct. 753 (1995), the use of the words "moral certainty" did not vitiate the charge, particularly in view of instructions that the Commonwealth's

---

[10]"What is proof beyond a reasonable doubt? Well, it's not proof beyond all doubt nor proof beyond a whimsical, fanciful doubt, nor proof beyond a probability of innocence because there is rarely a case so clear that it could be proved beyond the possibility of innocence."

burden required a "degree of certainty . . . [that] leaves in your mind a clear and settled conviction of guilt," and that the jury's harboring of "any reasonable doubt" as to any element of a crime required an acquittal.[11] See *id.* at 568 n.3, 571-572 (1994).

c. *Inferences.* The criticized portion of the instruction on inferences[12] (also not objected to) could not have led the jury to engage in unwarranted speculation. This statement was part of a lengthy explanation of circumstantial evidence and inferences which, considered as a whole, correctly stated the relevant principles and essentially cautioned the jury to be sure of the strength and logic of any inferences they drew.[13]

3. *Corroborative Identification Testimony.*

The defendant claims error in testimony of two Springfield detectives concerning out-of-court identifications made from photographic arrays by seven prosecution witnesses. Each of the witnesses identified the defendant in court and expressly testified that he had made a pretrial identification of a photograph of the defendant. The detectives corroborated the extra judicial identifications by verifying the photograph selected by each witness and testifying about the statements made by the witness when selecting the defendant's photograph.

The evidence was properly admitted. Each of the witnesses acknowledged in his testimony that he had made an out-of-

---

[11]The further language in the instructions that "[t]he defendant is entitled to a verdict of not guilty unless the evidence produced by the Commonwealth is sufficient to warrant a finding of guilty beyond a reasonable doubt" is entirely proper. The defendant's claim that the use of the word "sufficient" misdefined the burden of proof is baseless.

[12]"[Y]ou may draw reasonable inferences in connection with the evidence that you believe in this case, but you should not pile inference upon inference until the pile gets so high that it tips over logically or that the chain gets so weak that it doesn't hold together any more. So make sure that when you run through your inferences, you check the starting point and the ending point to make sure that they are still reasonable."

[13]It follows from our rejection of the defendant's claims concerning the portions of the jury instructions discussed above that no support exists for his additional argument that trial counsel was ineffective when he failed to object to the instructions.

court identification of the defendant. See *Commonwealth v. Daye*, 393 Mass. 55, 60-61 (1984); *Commonwealth v. Seminara*, 20 Mass. App. Ct. 789, 796 (1985). See also *Commonwealth v. Warren*, 403 Mass. 137, 141 (1988) (defendant's due process rights not violated as long as identifying witness is present in court, is available to be cross-examined, and acknowledges the extra judicial identification).

The defendant is also not aided by his argument that the identification testimony of the detectives was prejudicial because they recounted out-of-court statements by some of the identifying witnesses in words which went beyond the scope of the witnesses' trial testimony. The detectives' testimony as to what the witnesses Michael Bernard and David Stokes said at their pretrial identifications did not go significantly beyond the trial testimony of these witnesses. The apparently mistaken remark made by Detective Scammons about the pretrial identification made by the witness William Darko (not objected to at trial) could not have caused any harm.[14] The focus at trial was identification of the defendant as the assailant of Charles Stokes. All the eyewitnesses, including Darko, identified the defendant as the person standing over Charles Stokes with a handgun. One of the witnesses (Anthony Cooke) identified the defendant as the person who shot the victim. The jury had the full picture from the identifying witnesses themselves as to what was seen, and the case was put to the jury on the basis that they could find that the defendant fired the shot that killed Victoria Seymour, but even if they did not, they should nonetheless consider whether he was guilty as a joint participant in an armed robbery that resulted in her death.

4. *Ineffective Assistance.*

The defendant argues that the behavior of the police and prosecution concerning the alleged withholding of exculpatory evidence constituted an external governmental influence

---

[14] The detective testified that Darko had identified a photograph of the defendant "as being the individual who shot [the victim]." Darko gave no such testimony at trial.

which prevented his trial counsel from furnishing him with effective representation within the meaning of the Sixth Amendment to the United States Constitution. The argument lacks merit. As has been discussed, the judge properly concluded that the alleged misconduct had not occurred or that any particular nondisclosure that had occurred had not been shown by the defendant to be prejudicial.[15]

The defendant's trial counsel was also not ineffective for arguing in his opening statement that the evidence would prove the defendant's innocence. Counsel took the affirmative step in his opening of fully disclosing the defense theory of the case which was based on alibi and misidentification. The approach represented a reasonable tactical choice designed to stress to the jury at an early stage of the trial the importance of the anticipated evidence on alibi and misidentification and to leave for the defense closing the fact that the Commonwealth had the ultimate burden of proof beyond a reasonable doubt on all the issues including the issue of identification.

5. *Review under G. L. c. 278, § 33E.*

There is no basis for the grant of relief under G. L. c. 278, § 33E. No prosecutorial or police misconduct has been proved. There was considerable identification testimony establishing the defendant's guilt, and the issues of misidentification and alibi were for the jury to resolve. See *Commonwealth* v. *Auguste*, 418 Mass. 643, 648 (1994). The evidence of joint venture was also more than sufficient to warrant the defendant's convictions. See *Commonwealth* v. *Hooks*, 375 Mass. 284, 298-299 (1978).

---

[15]The defendant seeks to bring his claim within *United States* v. *Cronic*, 466 U.S. 648, 662 (1984), in which the United States Supreme Court indicated in dictum that there may be some rare circumstances involving an ineffective assistance claim where prejudice may be presumed "without inquiry into counsel's actual performance at trial." The discussion in the *Cronic* case, about a possible per se violation of a defendant's effective representation right, has no application to this case where trial counsel's performance was adequate. See *Scarpa* v. *Dubois*, 38 F.3d 1, 12-15 (1st Cir. 1994), cert. denied, 115 S. Ct. 940 (1995).

The order denying the defendant's motion for a new trial is affirmed. The judgments are affirmed.

*So ordered.*