COMMONWEALTH *vs.* RICHARD M. SIMMONS.

Middlesex. January 11, 1995. - February 8, 1995.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, & GREANEY, JJ.

*Evidence,* Photograph, Videotape, Relevancy and materiality, Expert opinion, Consciousness of guilt. *Practice, Criminal,* Argument by prosecutor, Instructions to jury, Judicial discretion, Capital case. *Homicide.*

At a murder trial, certain photographs of the victim and of the interior of the apartment where the killing occurred and a videotape showing the apartment and the victim's body were all properly admitted as relevant to issues at trial, and the videotape provided the jury with an accurate and fair representation of the entire crime scene. [430-432]

On review of a first degree murder conviction pursuant to G. L. c. 278, § 33E, admissions in evidence of graphic photographs did not result in an unfair trial or cause the defendant prejudice. [432]

At a murder trial the judge properly ruled that a chemist was qualified as an expert in blood pattern analysis. [432-433]

At a murder trial, certain closing remarks by the prosecutor which went beyond logical inferences that could be drawn from the evidence were improper; prejudice was unlikely, however, where there was abundant evidence of the defendant's guilt: the judge correctly denied the defendant's motion for a mistrial. [433-434]

There was no basis in the record of a murder trial to warrant the judge to give the jury instructions on consciousness of guilt. [434-435]

This court, reassessing its decision in *Commonwealth* v. *Cruz,* 416 Mass. 27 (1993), stated that the better practice, in accordance with the principles expressed in *Commonwealth* v. *Toney,* 385 Mass. 575, 585 (1982), is to leave to the sound discretion of the trial judge whether to instruct the jury on their evaluation of consciousness of guilt evidence. [435-436]

No reason appeared in the record of a trial for first degree murder for this court to exercise its power under G. L. c. 278, § 33E, to direct the entry of a verdict of a lesser degree of guilt. [436]

INDICTMENT found and returned in the Superior Court Department on September 28, 1989.

The case was tried before *John P. Forte*, J., sitting under statutory authority.

*Dana A. Curhan* for the defendant.

*David W. Cunis*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. The defendant was found guilty of murder in the first degree by reason of extreme atrocity or cruelty. Represented by new counsel on appeal, he argues that there should be a new trial because the judge erred in (1) admitting in evidence photographs, showing the crime scene and the victim, and a videotape of the crime scene; (2) qualifying a chemist from the Department of Public Safety as an expert on blood pattern analysis; (3) denying a motion for a mistrial based on improper remarks in the prosecutor's final argument; and (4) failing to instruct the jury on the issue of consciousness of guilt. He also argues alternatively that we should exercise our authority under G. L. c. 278, § 33E (1992 ed.), to order the reduction of the verdict to one of guilty of either murder in the second degree or voluntary manslaughter. We reject the defendant's arguments, and we also find no basis to grant relief under G. L. c. 278, § 33E. Accordingly, we affirm the defendant's conviction.

The background of the case is as follows. In 1989, the defendant and the victim, Denise Simmons, his wife of almost six years, were living in a second-floor apartment in a two-family house at 32 Humphrey Street in Lowell. The defendant's grandmother owned the house and lived on the first floor. On August 14, 1989, the victim moved out of the marital apartment and started living with another man.

On September 5, 1989, the victim drove this man to work at about 7 A.M., after which she went to 32 Humphrey Street. Around 8 A.M., the defendant's grandmother heard "a lot of shouting" coming from the second-floor apartment. Shortly thereafter the grandmother heard the victim calling out "Nana, Nana" (the victim referred to the defendant's grandmother by this title).

The Lowell police were promptly called and obtained entry to the second-floor apartment. The kitchen was spattered

with blood, and there was a large pool of blood on the kitchen floor. A bloody eleven-inch wooden-handled butcher knife with a six-inch blade was on the kitchen floor, and a woman's high-heeled shoe was near the bathroom door. The defendant was found lying on his back on a bed in the bedroom bleeding from chest wounds and holding a towel or compress to his chest. He was taken to the hospital, where he told a doctor that he had stabbed himself. The defendant was admitted to the hospital for treatment of his injuries which included a partially collapsed lung.

After the defendant had been attended to, the police gained access to the bathroom where they found the victim's body along with a considerable amount of blood. It appeared that the victim had fled to the bathroom where she had collapsed and died. The medical examiner testified that the victim had died from eleven stab wounds to several parts of her body one of which (inflicted on the victim's back) severed her pulmonary artery. There was additional testimony by the medical examiner that at least two of the victim's wounds were "defensive" wounds (namely, resulting from the victim trying to protect herself), and that the victim's wounds were consistent with the use of a six-inch blade comparable to the blade on the butcher knife found on the kitchen floor.

The defendant did not testify or call any witnesses in his behalf. In final argument, the defendant's trial counsel conceded that the defendant killed the victim. The defendant's trial counsel pointed to evidence that the victim had left the defendant, and he suggested to the jury that the victim must have told the defendant, just before the killing, that she was living with another man (necessarily suggesting that she had a sexual relationship with that man). The defendant's trial counsel also expressed the opinion that, after stabbing the victim, the defendant had tried to kill himself, and he emphasized evidence concerning the defendant's emotional state

after the killing[1] and at the hospital after he learned of the victim's death.[2] Based on these circumstances, and other evidence, the defendant's trial counsel urged the jury to find the defendant guilty of manslaughter.[3]

The prosecutor argued that the defendant should be convicted of murder in the first degree by reason of either deliberate premeditation or extreme atrocity or cruelty. The prosecutor maintained that there was no basis in the evidence to warrant a verdict of manslaughter and that the defendant's self-inflicted wounds were purposeful and showed that he had planned the crime. The judge fully instructed the jury on both theories of murder in the first degree, murder in the second degree, and voluntary and involuntary manslaughter.[4]

---

[1] A police officer present at the scene described the defendant as being "almost in a catatonic state"; his eyes were open, but he was not speaking or responding to questions.

[2] There was testimony that, when he was told of the victim's death, the defendant became upset, tearing out his intravenous needles, yelling for nurses, and saying that he did not want further treatment, and that he wanted to be left alone to die.

[3] The defendant's trial counsel summarized the defendant's position in these terms:

> "In doing that, I will submit to you that you will see all of the emotions that built upon [the defendant], and when he erupted on September 5th, 1989, as reflected by the events prior to that date, and as reflected by the events that took place later in the day, and as you look at the amount of blood loss that he had — [the victim] also had lost a great deal of blood — that you realize that his actions were that of a heat of passion, as a result of hearing for the first time that morning that she was living with another man . . . and you can infer reasonably that she was having sex, and that was just the crux. All of those other factors that came to his life, he exploded.
>
> "As a result of that explosion, I would ask you to return a verdict in this particular case of guilty, guilty of manslaughter in the death of [the victim]."

[4] The voluntary manslaughter instruction could have been based on the discussion in *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180-182 (1981), S.C., 390 Mass. 722 (1984), that evidence from which a jury could find that a defendant shot his wife in the heat of passion after her sudden admission of adultery required an instruction on voluntary manslaughter. The involuntary manslaughter instruction was given on the theory that the defendant had acted recklessly in killing the victim.

As has been indicated, the jury found that the defendant had acted with malice and was guilty of murder in the first degree by reason of extreme atrocity or cruelty.

1. The judge admitted forty-two photographs in evidence. Three photographs showed the exterior of the two-family house where the defendant and the victim lived, thirty-two photographs showed the interior of their second-floor apartment, and seven photographs taken in the autopsy room depicted the victim and her stab wounds. The judge also allowed the jury to see a videotape of approximately twelve-minutes' duration. The videotape was recorded by the police at the crime scene and showed the interior of the second-floor apartment and the victim's body in the bathroom where she had been found. The defendant objected to the videotape, the seven photographs of the victim's body, and six of the photographs of the interior of the apartment.

The defendant argues that the judge allowed an excessive number of photographs of the interior of the apartment showing blood stains, spatters, and smears, and that the videotape was duplicative of what was shown in these photographs. The defendant also maintains that, since the defendant conceded that he had killed the victim, the photographs showing her body and wounds were unnecessary and added to the potentially gruesome effect of the other photographs.

"The admissibility of photographic evidence is left to the discretion of the trial judge, and we will overturn the judge's decision only where a defendant is able to bear the heavy burden of demonstrating an abuse of that discretion." *Commonwealth* v. *Waters*, 399 Mass. 708, 715 (1987). See *Commonwealth* v. *Richenburg*, 401 Mass. 663, 672 (1988). "[I]f the photographs possess evidential value on a material matter, they 'are not rendered inadmissible solely because they are gruesome [or duplicative] or may have an inflammatory effect on the jury.' *Commonwealth* v. *Bys*, 370 Mass. 350, 358 (1976)." *Commonwealth* v. *Ramos*, 406 Mass. 397, 406 (1990). See *Commonwealth* v. *Benson, ante* 114, 118 (1994) (stating same rule).

We have examined the disputed photographs. The photographs of the victim were clearly relevant as to whether the murder was committed with extreme atrocity or cruelty. *Commonwealth* v. *Sielicki*, 391 Mass. 377, 382 (1984). The victim was alive when the eleven wounds were inflicted. None of the photographs taken in the autopsy room showed her body in an altered state. The judge was not required to exclude the photographs in view of the defendant's admission to having stabbed the victim. The issue of malice was disputed, and the judge reasonably could have decided that the prosecution was entitled to place before the jury photographs which suggested that the defendant had acted with malice and had committed the murder in a manner which could be found to be extremely atrocious or cruel.

There was also no error in the admission of the disputed photographs of the interior of the apartment. These photographs were relevant to understanding the testimony of the Commonwealth's expert witness (which we shall discuss shortly) and to proving the Commonwealth's contentions about the defendant's movements and actions. The fact that some of these photographs might have been duplicative did not mandate their exclusion.

The judge also did not abuse his discretion in allowing the jury to view the videotape. We have seen the videotape which provides panoramic views of the entire apartment. We agree with the judge that the videotape would indicate to the jury that the apartment was not quite as blood drenched as the photographs might have led them to believe. We also agree with the Commonwealth that the videotape was relevant to support its contention that the crime, and the defendant's subsequent actions, were the product of deliberation rather than the result of an emotional outburst which might have caused a bloodier scene.[5] We have indicated that a videotape

---

[5]Contrary to the defendant's assertion, the videotape does not disclose a "dramatic close-up" of the victim's face. The videotape shows the victim's body as it was found in the bathroom wedged in a small space between the bathtub and bathroom wall. The side of the victim's face is visible at a distance of what appears to be at least several feet.

can be a reliable evidentiary source, and we conclude that the videotape in this case provided the jury with an accurate and fair representation of the entire crime scene. See *Commonwealth* v. *Lavalley*, 410 Mass. 641, 645 (1991); *Commonwealth* v. *Carey*, 26 Mass. App. Ct. 339, 340 (1988).

The defendant urges us to become more "proactive" in considering assertions that photographs of victims and crime scenes in murder cases are prejudicially inflammatory. The rule in this area is, as has been stated, one of trial judge discretion. Whether photographic evidence is unnecessary or inflammatory must be considered on a case-by-case basis against the issues that have been raised at trial. We caution, however, that trial judges must take care to avoid exposing the jury unnecessarily to material that might inflame the jurors' emotions and possibly deprive the defendant of an impartial jury. In addition to considering whether the judge has abused his discretion, we also consider under G. L. c. 278, § 33E, in a case in which the defendant has been convicted of first degree murder, the over-all fairness of the trial. In a situation in which the use of photographs may cause prejudice or is especially unfair, or where this admonition has not been followed, the existing standards of review provide a sufficient basis to grant relief to a defendant. The disputed evidence in this case, while graphic, as evidence of this type usually will be, did not cross the line between propriety and impropriety.

2. The Commonwealth offered a chemist from the Department of Public Safety as an expert in blood pattern analysis. The judge conducted a voir dire, after which he found the witness to be a qualified expert and allowed him to express opinions, based on the photographs of the crime scene discussed above and other evidence, about the blood patterns found in the apartment. The chemist's testimony indicated when and how the blood had been deposited and illustrated the likely movements of the defendant and the victim during

and after the stabbing.[6] The evidence was used by the Commonwealth to argue premeditation and malice and to rebut the defendant's contention that he had acted as a result of provocation.

The defendant does not dispute that the witness was a qualified chemist or that blood pattern analysis is a proper subject of expert opinion. See *Commonwealth* v. *Ramos, supra* at 406. He argues that the judge abused his discretion in qualifying the chemist as an expert in blood pattern analysis. There is nothing to the argument. The chemist's qualifications, background, and testimony at several Superior Court trials on blood pattern analysis adequately supported the judge's discretionary ruling that the chemist was qualified to testify on the blood pattern analysis he had made in this case. See *Commonwealth* v. *Garabedian*, 399 Mass. 304, 310 (1987). See also *Commonwealth* v. *Mahoney*, 406 Mass. 843, 852 (1990) (determination by trial judge that an expert witness possessed "sufficient skill, knowledge, and experience in the area of his training to aid a jury," is adequate to permit expert testimony).

3. There was testimony that the defendant had served in the United States Army. In his closing argument, the prosecutor asked the jury, when they considered the evidence of stab wounds that had been directed at the victim's vital organs, to remember that "[the defendant] was in the Army, because he knows how to kill." Later in his closing argument, the prosecutor referred to the evidence that, when found by the police the defendant was holding a compress or towel on his own stab wounds, and stated that the defendant treated himself because "[h]e was in the Army . . . [h]e knows first aid." The defendant's trial counsel objected to

---

[6]This evidence tended to show that the defendant may have washed the knife and his hands after he stabbed the victim, inflicted two less serious stab wounds on himself, and then stood in the kitchen next to the bathroom door while the victim was dying in the bathroom. This evidence also indicated that the defendant walked to his bedroom, changed his clothes, and laid down on the bed before the police arrived.

these remarks and moved for a mistrial which the judge denied. The defendant now argues that a mistrial was required.

The prosecutor's remarks went beyond logical inferences that could be drawn from the evidence and, consequently, were improper. The jury were told by the judge that closing arguments were not evidence and were intended by counsel to express a point of view. There was abundant evidence that the defendant had brutally stabbed the victim to death, and evidence that he had stabbed himself and had tended to his own wounds. In light of all the evidence, the arguments by both counsel, and the judge's instructions, and, assuming that the jury would take the excessive rhetorical flourishes that were made in both closings with a "grain of salt," we conclude that prejudice from the prosecutor's two remarks was unlikely. The motion for a mistrial was properly denied.

4. Trial of this case was completed on August 24, 1990. On August 3, 1993, this court decided *Commonwealth* v. *Cruz*, 416 Mass. 27 (1993), and stated that, when there is evidence at a criminal trial tending to show the defendant's consciousness of guilt, the judge on his or her own initiative, is required to instruct the jury in accordance with the principles expressed in *Commonwealth* v. *Toney*, 385 Mass. 575, 585 (1982), and that, if the defendant affirmatively requests that the required instructions not be given, the judge should exercise discretion as to whether to grant the request. *Commonwealth* v. *Cruz*, *supra* at 29-31, 33. The defendant now perceives the evidence indicating that he had stabbed himself as evidence tending to show consciousness of guilt. Based on this perception, the defendant argues that the *Cruz* decision should be applied retroactively to this case, and that, since the judge gave no instructions as required by the *Cruz* case on how the jury should evaluate consciousness of guilt evidence, there was a failure to instruct on an important point which requires a new trial.

The contention is seriously misplaced. The evidence about the defendant having stabbed himself was not admitted, or considered, by either counsel at trial or by the judge, as evidence of consciousness of guilt. The Commonwealth relied on

the evidence to argue that the defendant had stabbed himself as a deliberate part of his murder plan. The defendant relied on this evidence to argue that his emotional state warranted a verdict of manslaughter. The requests for jury instructions contained no request on the subject of consciousness of guilt. The central issue at trial concerned malice, as to which consciousness of guilt evidence would have had no relevance. See *Commonwealth* v. *Cohen*, 412 Mass. 375, 392 (1992), and cases cited. The defendant's present argument must be rejected because it has no basis in the trial record.

This case, however, presents an occasion to reassess the statements in the *Cruz* decision which require a judge, on his or her own initiative, to instruct the jury on their evaluation of consciousness of guilt evidence. Prior to the *Cruz* decision, the determination whether to charge the jury under the *Toney* formula (assuming that the judge had decided that there was evidence in the first place which tended to show consciousness of guilt) was usually left to the sound discretion of the judge. Generally, if the prosecutor or defense counsel sought jury instruction on the subject they would be entitled to the benefits of such instruction, including an admonition to the jury concerning the dangers inherent in drawing an inference of guilt from the evidence, and a warning not to convict on the basis of such evidence alone. A prosecutor might choose not to request a consciousness of guilt instruction because the evidence raising the issue was of peripheral value and the instruction could divert the jury from considering other probative evidence on which the prosecutor based the case for conviction. A defense attorney also, as matter of trial tactics, might not want to request a consciousness of guilt charge if none is requested by the Commonwealth or given, sua sponte, by the judge. Defense counsel might feel that it would not assist the defendant's case to have the judge focus the jury's attention on such matters as flight or concealment, even with cautionary language on how the evidence is to be weighed. Counsel at the trial might wish only to discuss evidence suggesting consciousness of guilt in clos-

ing arguments or simply to leave it for the jury's reflection unadorned by comment either by them or the judge.

We now think the better practice is not to require that a judge, on his or her own initiative, instruct on the subject. The matter is left to the sound discretion of the judge, and it will not be error if he or she chooses not to instruct on the subject in the absence of a request.

5. There is no reason to exercise our authority pursuant to G. L. c. 278, § 33E, to direct the entry of a verdict of murder in the second degree or manslaughter. As the conscience of the community, it was within the jury's province to determine whether the murder was committed with extreme atrocity or cruelty. See *Commonwealth* v. *Merola*, 405 Mass. 529, 548 (1989). The stabbing of the victim constituted a brutal killing done with malice. "The jurors were in the best position to determine whether the domestic difficulties [between the defendant and the victim] were so egregious as to require a verdict of a lesser degree of guilt." *Commonwealth* v. *Schnopps*, 390 Mass. 722, 728 (1984). The jury's verdict was justified.

*Judgment affirmed.*