## COMMONWEALTH *vs.* EDWARD MARTINEZ.

Middlesex. December 8, 1999. - April 10, 2000.

Present: MARSHALL, C.J., ABRAMS, GREANEY, IRELAND, & COWIN, JJ.

*Practice, Criminal,* Required finding, Presumptions and burden of proof, Instructions to jury, Assistance of counsel, Cross-examination by prosecutor, Comment by prosecutor, Capital case. *Homicide. Evidence,* Threat, Relevancy and materiality, Hearsay, Identification, Verbal completeness, Cumulative evidence, Cross-examination, Presumptions and burden of proof, Inference, Consciousness of guilt. *Witness,* Credibility. *Jury and Jurors. Constitutional Law,* Assistance of counsel.

At a murder trial, there was sufficient evidence of the defendant's premeditation to support a conviction. [172-173]

At the trial of an indictment for murder in the first degree, the judge erred in allowing a witness to testify that she had been threatened by the defendant's niece; however, any prejudice to the defendant was cured by the judge's immediate limiting instruction which was repeated in the final instructions; moreover, other strong evidence against the defendant made it unlikely that the error affected the result. [173-175]

At a murder trial, error in allowing a police witness to recount all of an eyewitness's complete statement, beyond her identification of the defendant, was not prejudicial where it was merely cumulative of that witness's testimony at trial. [175, 176]

The doctrine of verbal completeness with respect to an identifying witness's statement to police extends only to the witness's identification of the defendant, and statements of the witness on other subjects are not admissible under that doctrine. [175-176]

At the trial of a murder case, the prosecutor improperly questioned the defendant about the fact that the defendant had heard all of the Commonwealth's case before he took the stand, but where the improper conduct was limited to two questions and where the prosecutor did not argue or suggest that the jurors should draw an inference adverse to the defendant, the error did not require that the defendant be granted a new trial. [176-177]

At a murder trial, the prosecutor's improper questioning of the defendant regarding the credibility of a Commonwealth witness did not, in the circumstances, require that the defendant be granted a new trial. [177-178]

At a murder trial, the prosecutor improperly inquired of the defendant whether he could produce a certain item of clothing he had worn on the day of the murder, which the prosecutor himself had in his possession and shortly thereafter introduced in evidence; however, the single question did not create a substantial likelihood of a miscarriage of justice in light of the judge's instructions on the Commonwealth's burden of proof. [178-179]

The cumulative effect of prosecutorial errors at a murder trial was no more prejudicial than the individual errors, which had minimal impact. [179]

At a murder trial, the judge properly inquired, on the defendant's motion, of certain jurors as to their ability to be impartial, and properly relied on the jurors' statements in determining that no good cause was shown to necessitate the discharge of any of them. [179-180]

At a murder trial, the judge correctly excluded evidence that an identification witness had been arrested and arraigned on drug-related charges after the murder but before the defendant's trial, where the witness's testimony did not differ from her prearrest testimony, and thus there was no basis for an assertion of bias. [180-181]

There was no error at a murder trial arising from the prosecutor's questioning the defendant about his knowledge of firearms, where the defendant had raised the issue of his military training on direct examination; other comments of the prosecutor about the defendant's testimony as to his military service were based on the evidence and were not improper. [181]

There was no merit to a claim by a criminal defendant that questions of the prosecutor improperly raised a missing witness inference. [181-182]

At a murder trial, the prosecutor's argument that the defendant was attempting to keep a witness quiet about the defendant's inculpatory statements was based on facts in evidence. [182]

There was no merit to a criminal defendant's claim that the prosecutor "taunted" him when conducting cross-examination. [182]

At the trial of a murder case, testimony of a police officer that, during an interview at the police station, the defendant had stated that he did not want to talk any more and had terminated the interview, was properly introduced in the context of the entire conversation to explain why the interview ended abruptly. [182-184]

At a murder trial, there was no basis in the evidence to support an instruction on manslaughter, and there was no error in the judge's not so instructing the jury. [184]

A criminal defendant did not demonstrate that any asserted errors of his trial counsel created a substantial likelihood of a miscarriage of justice or that better work might have accomplished something material for the defense; the defendant was not entitled to a new trial on the ground of ineffective assistance of counsel. [184-187]

INDICTMENT found and returned in the Superior Court Department on September 28, 1994.

The case was tried before *Elizabeth J. Dolan*, J., and a motion for a new trial was heard by her.

*Jane Larmon White*, Committee for Public Counsel Services, for the defendant.

*David W. Cunis*, Assistant District Attorney, for the Commonwealth.

ABRAMS, J. Convicted of murder in the first degree on the

theory of deliberate premeditation, the defendant appeals. Prior to the appeal being heard, the defendant moved to strike the original brief filed on his behalf. A single justice of this court declined to strike the brief[1] and a motion for a new trial was remanded to the Superior Court. After hearing, the Superior Court judge denied the defendant's motion for a new trial. The defendant appeals from his conviction of murder in the first degree and from the denial of his motion for a new trial. The appeals have been consolidated. For the reasons stated in this opinion, the defendant's conviction is affirmed. We decline to exercise our power under G. L. c. 278, § 33E, to order a new trial or entry of a lesser degree of guilt on the conviction of murder in the first degree.[2]

1. *Facts.* (a) *The events leading up to the murder.* We summarize the facts, viewing the evidence in the light most favorable to the Commonwealth. See *Commonwealth* v. *Salemme,* 395 Mass. 594, 595 (1985). The defendant, Edward Martinez, was convicted of the premeditated murder of Freddys Abreu. The defendant and the victim lived in the same apartment building. The defendant shared an apartment with his father, his girl friend, Melissa Gaulin, and Gaulin's baby. The victim shared an apartment with his wife, Jaquay Abreu, and their daughter. The two couples were friendly with one another and visited one another's apartments. Jaquay Abreu, the victim's wife, testified that she also spoke with the defendant on the telephone.

The victim sold crack cocaine and, shortly after moving into the apartment building, asked the defendant to join him in selling drugs. The defendant and the victim sold crack cocaine out of the apartment building for approximately two or three months before the murder.

Sometime before the murder, the victim purchased a silver handgun. Because the victim's wife objected to having a handgun in their home, the victim asked the defendant to keep the gun for him. The victim also gave the defendant approximately $1,000 worth of cocaine to hold. One day later, the victim asked the defendant to return the gun and the cocaine.

[1] Thus, that brief is before us as well as the new brief filed on behalf of the defendant.

[2] The defendant was also convicted of possession of an unlicensed firearm, for which he was sentenced to serve a concurrent term not exceeding five years and not less than two and one-half years. The defendant does not allege any error concerning this conviction.

The defendant refused to do so. An argument ensued. Two days later, the defendant's girl friend, Gaulin, reported to the police that the victim had been looking for the defendant and had threatened to kill her. Afraid, Gaulin went to stay with the defendant's sister.

(b) *The murder.* The next day, the victim, who apparently was friendly with the defendant's father, went to the defendant's apartment with a frozen dinner for the defendant's father. At approximately 10 P.M., the victim left the apartment building in his car and drove to the defendant's sister's apartment. The defendant came out to the victim's car along with Jacob Sanchez, the defendant's nephew. There was a brief argument, after which the victim drove away.

According to the testimony of Gaulin, Jacob Sanchez told the defendant to "get the gun." Gaulin saw the defendant take the silver gun from a bag in his sister's apartment and put it back. She then went upstairs. The defendant and Sanchez left.

At approximately 10:20 P.M., the victim returned to his apartment building. His wife heard his car pull up and looked out the window. She saw three men, dressed in dark clothing and hooded sweatshirts, approach her husband's car. She recognized one of the men as the defendant by his voice. The victim's wife saw the defendant pull out a gun and fire it twice at the victim. She recognized the gun as the silver gun the victim had given the defendant several days earlier.

That night, the defendant returned to his sister's apartment alone. Gaulin noticed that he was shaking and sweating. He told her, "I did it," or "[w]e did it," and stated that he "didn't want to kill him." The defendant also told Gaulin that he had gotten rid of the gun.

(c) *The defendant's arrest.* The night of the murder, the victim's wife told the police that she had witnessed the defendant murder her husband. The police began a search of the area. The next morning, the police learned that the defendant was at his sister's apartment. When the police found him, the defendant agreed to speak with them at the police station.

The defendant initially denied knowing the victim. Later in the interview, however, the defendant admitted to selling crack cocaine for the victim. The defendant also told the police that he had severed his relationship with the victim several days earlier because the victim was not paying him enough. The defendant said that he knew the police were looking for him

and that he had run to another floor in the apartment building to hide earlier that day. When the police asked why the defendant thought the police were looking for him, the defendant terminated the interview.

(d) *The trial.* The defendant's claims of errors center on his own testimony and that of two of the Commonwealth's witnesses — Jaquay Abreu and Gaulin. Jaquay Abreu, the victim's wife, testified that she saw the defendant shoot her husband. She stated that she identified the defendant as the shooter based on his voice and on what she could see from her window. The force of this evidence was strengthened by Abreu's testimony as to her knowledge of the defendant because of visits and telephone conversations with the defendant. Gaulin described the defendant's behavior before and after the murder, including his inculpatory statements immediately after the murder.

The defendant proceeded on the theory that the victim's wife misidentified the murderer. The defendant testified that he and the victim argued on the night of the murder over the defendant's refusal to return the cocaine and the gun. The defendant also testified that his nephew, Jacob Sanchez, suggested they kill the victim.

According to the defendant's testimony, he pulled the gun out of a bag, but returned it to the bag when his girl friend became upset. The defendant's testimony indicated that he returned to his apartment building on the night of the murder because he was concerned about his father's safety. According to the defendant, he was knocking on the door of his apartment when he heard the two shots that killed the victim. The defendant's strategy focused on implicating Sanchez as the murderer.

2. *Motions for required finding of not guilty.* The defendant claims that the judge erred in denying his motions for a required finding of not guilty. According to the defendant, the evidence was insufficient on the element of premeditation.

In reviewing the denial of a motion for a required finding of not guilty, we consider whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia,* 443 U.S. 307, 318-319 (1979). Viewed in the light most favorable to the Commonwealth, the evidence would permit a rational juror to infer that the defendant, after quarreling with the victim, took a gun from his sister's home, rode to the victim's location, pointed the

firearm at the victim's head, and fired. "The use of a firearm in the killing is sufficient to support a verdict of murder in the first degree based on deliberately premeditated malice aforethought. . . . Evidence that the defendant brought a gun with him to the scene . . . is evidence of planning" (citations omitted). *Commonwealth* v. *Williams*, 422 Mass. 111, 123 (1996). There was sufficient evidence to support a conviction.

3. *Errors at trial.* (a) *Admission of the threat.* Gaulin testified to the defendant's inculpatory statements and behavior after the murder. Gaulin became upset during her testimony. The judge ordered a recess, during which the prosecutor suggested that Gaulin's demeanor might be attributable to threats that the defendant's niece had made against Gaulin. According to Gaulin's subsequent testimony, the defendant's niece said that if Gaulin "put her uncle in jail that she'll come and kill [Gaulin]."

Because Gaulin asked the prosecutor if she could "get in trouble for testifying," the judge became concerned that Gaulin was afraid she might incriminate herself. The judge ordered that an attorney unrelated to the case be brought in to speak with Gaulin. The attorney spoke in private with Gaulin, and then told the judge that he had "just talked to a nervous young woman who stated that she has been threatened. She's concerned about that . . . ." The attorney also reported that Gaulin was generally nervous about testifying but that no privilege under the Fifth Amendment to the United States Constitution applied. Based on the attorney's report, the judge permitted the Commonwealth to question Gaulin before the jury, over the defendant's objection, about the threat.

The defendant claims that the judge erred in allowing Gaulin's testimony as to the threat.[3] We agree. Because the defendant objected at trial, we review to determine whether there was prejudicial error. See *Commonwealth* v. *Vinnie*, 428 Mass. 161, 164 n.3, cert. denied, 525 U.S. 1007 (1998) (issue preserved by objection at trial). We conclude that there was not.

"Evidence is relevant if it has a rational tendency to prove a material issue. Whether evidence is relevant in any particular

---

[3]The defendant also complains that the judge "failed to comprehend what factors had to be weighed" in determining whether to admit the testimony. The defendant apparently bases this claim on the fact that the judge did not explain her thought process in overruling the defendant's objection. A judge is not required to state her grounds for excluding testimony. *H.H. Hawkins & Sons Co.* v. *Robie*, 338 Mass. 61, 66 (1958).

instance, and whether the probative value of relevant evidence is outweighed by its prejudicial effect, are questions within the sound discretion of the judge." *Commonwealth* v. *Valentin*, 420 Mass. 263, 270 (1995), quoting *Commonwealth* v. *Dunn*, 407 Mass. 798, 807 (1990).

We conclude that the prejudicial effect of the threat testimony outweighed its probative value. There was no suggestion that material aspects of Gaulin's testimony changed because of the threat. Therefore, the probative value of any evidence that the defendant's niece threatened Gaulin before she testified was minimal. However, the danger that the jurors would use evidence of a threat improperly was significant. As the defendant points out, the jurors might have associated the bad conduct of the defendant's niece with the defendant or given Gaulin's testimony artificially inflated weight because she testified despite being threatened. The judge implicitly acknowledged these dangers by giving two limiting instructions.[4]

Although the admission of the threat testimony was error, the error was not prejudicial to the defendant. The judge's limiting instructions were strong and stated the law correctly. We assume that the jurors followed the judge's instructions. See *Commonwealth* v. *Rosa*, 422 Mass. 18, 29 (1996).[5]

In addition, although Gaulin's testimony was important to the Commonwealth's case, it was not indispensable. Gaulin testified

---

[4]Immediately after Gaulin testified as to the threat, the judge instructed the jury that they could consider the threat only in relation to Gaulin's demeanor. The judge instructed that, "if believed, such threats cannot be held against this defendant nor . . . place the defendant in a negative light before a jury, even though it may have been done by someone who is related . . . to this particular defendant. It must be considered an independent enterprise on the part of the person making the threat. . . . [W]hatever [the defendant's niece] may or may not have done — that's up to you to determine on the subject of this witness's credibility — but you cannot carry that over to the defendant." The judge gave a substantially similar instruction in her final instruction to the jurors.

[5]The defendant suggests that the judge's instruction "may be tantamount to asking the jury to ignore that an elephant has walked through the jury box." *Commonwealth* v. *Flebotte*, 34 Mass. App. Ct. 676, 680 (1993), *S.C.*, 417 Mass. 348 (1994) (reversing conviction) (involving a four year old's fresh complaint that she was burned with cigarettes by her father). Melissa Gaulin's testimony as to the threat did not have the "gripping quality" of the testimony referred to in *Flebotte*. There is, therefore, no reason to think that the jurors were unable to follow the judge's limiting instruction. See *Commonwealth* v. *Rosa*, 422 Mass. 18, 29 (1996).

that she heard the defendant confess to the murder. Her credibility was questionable, not solely because of her demeanor on the stand, but also because the jurors were aware that she had given contradictory statements to the police. The jurors heard the victim's wife testify to witnessing the defendant shoot the victim. Given such strong testimony, we do not think that the judgment was "substantially swayed" by the erroneous admission of threats against a witness who testified to the defendant's inculpatory behavior after the murder. See *Commonwealth* v. *Vinnie, supra* at 163, and cases cited.

(b) *Admission of identification testimony.* The defendant claims that the judge erred in admitting hearsay testimony about a statement Jaquay Abreu gave to Detective Kevin Sullivan on the night of the murder. At trial, Detective Sullivan testified, over the defendant's objection, as to Abreu's statement, which included Abreu's description of how many shots were fired, the color of the gun, and the defendant's behavior after the murder.

Where an identifying witness is available for cross-examination and does not dispute the out-of-court identification, the testimony of a third person who observed the extrajudicial identification is admissible for both corroborative and probative purposes. See *Commonwealth* v. *Schand*, 420 Mass. 783, 795-796 (1995); *Commonwealth* v. *Daye*, 393 Mass. 55, 60-61 & n.8 (1984). Such testimony may extend to out-of-court descriptions of a perpetrator's physical characteristics, *Commonwealth* v. *Weichell*, 390 Mass. 62, 72 (1983), cert. denied, 465 U.S. 1032 (1984), or clothing, *Commonwealth* v. *Morgan*, 30 Mass. App. Ct. 685, 690 (1991).

The Commonwealth argues that all of Detective Sullivan's testimony was proper under the verbal completeness doctrine. See *Commonwealth* v. *Watson*, 377 Mass. 814, 826-831 (1979). The doctrine's reach does not extend as far as the Commonwealth argues. "Whenever statements of a person are put in evidence, all that was said or written by him at the same time and upon the same subject becomes admissible; but other statements, even though made at the same time, are not admissible unless they are upon the same subject matter." *Commonwealth* v. *Watson, supra* at 828, quoting W.B. Leach & P.J. Liacos, Massachusetts Evidence 320 (4th ed. 1967). For the purpose of testimony on extrajudicial identifications, the verbal completeness doctrine extends only to testimony as to the identifying

witness's identification of the defendant. See *United States* v. *Paredes-Rodriguez*, 160 F.3d 49, 57-58 (1st Cir. 1998) (interpreting Fed. R. Evid. 801[d][1][C], which states that "[a] *statement* is not hearsay if . . . [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . one of identification of a person made after perceiving the person" [emphasis added]).[6]

Because there was error in allowing the detective to testify as to Abreu's complete description of events after the murder, we must determine whether the error prejudiced the defendant.[7] See *Commonwealth* v. *Vinnie, supra.* We conclude that it did not.

The detective's testimony was duplicative of Abreu's testimony. "The admission of cumulative evidence does not commonly constitute reversible error." *Commonwealth* v. *Bart B.*, 424 Mass. 911, 915 (1997). See *Commonwealth* v. *Schand, supra* at 796 (no prejudice because "[t]he jury had the full picture from the identifying witnesses themselves as to what they had seen"). Nor was this a case where, as the defendant claims, "prejudice is self-evident [because] one party's version of an incident is allowed to be repeated again and again." *Commonwealth* v. *Licata*, 412 Mass. 654, 659-660 (1992), quoting *Cole* v. *State*, 83 Md. App. 279, 286 (1990). Abreu's version of events was described twice, once by Abreu herself and once by Detective Sullivan. The limited portion of the testimony that went beyond the identification was not prejudicial error.

(c) *Implying fabrication by defendant.* The defendant correctly asserts that the prosecutor improperly questioned the defendant as to the fact that the defendant sat through the Com-

---

[6]Our approach accords with the reasoning behind exempting out-of-court identifications from the hearsay rule. " 'The premise . . . was that, given adequate safeguards against suggestiveness, out-of-court identifications were generally preferable to courtroom identifications,' because of the problem of fading memories." *United States* v. *Paredes-Rodriguez*, 160 F.3d 49, 58 (1st Cir. 1998), quoting *United States* v. *Owens*, 484 U.S. 554, 563 (1988). The same issue does not exist with respect to a witness's description of events.

[7]Jaquay Abreu was available for cross-examination. Therefore, the defendant's confrontation right was not implicated by the admission of the detective's hearsay testimony, and we need not determine whether the error was harmless beyond a reasonable doubt. See *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163, cert. denied, 525 U.S. 1007 (1998), and cases cited. Because the defendant objected at trial, we review for prejudicial error. See *id.*

monwealth's case.[8] See *Commonwealth* v. *Person*, 400 Mass. 136, 140 (1987) (reversing defendant's conviction). "[T]o use against the defendant his strategy to wait until after the prosecution had made its case before revealing his story would disparage the constitutional rights which allowed him that strategy." *Commonwealth* v. *Beauchamp*, 424 Mass. 682, 690-691 (1997).

As in *Commonwealth* v. *Person, supra*, this case hinged on the jurors' assessment of the defendant's credibility. However, unlike in *Person*, the improper conduct in this case was limited to two questions.[9] The prosecutor did not suggest to the jurors, either through questioning or closing argument, that they should draw an inference adverse to the defendant because the defendant heard the testimony against him. Contrast *Person, supra*. Therefore, the error did not "weaken[] [the defendant's] case in some significant way so as to require a new trial." *Commonwealth* v. *Mahar*, 430 Mass. 643, 650 (2000), quoting *Commonwealth* v. *Schulze*, 389 Mass. 735, 741 (1983).

(d) *Asking defendant to comment on witness's veracity.* The defendant argues that it was improper for the prosecutor to ask several questions requiring the defendant to comment on the veracity of another witness, Gaulin.[10] It is "improper to ask the defendant to testify to the credibility of other witnesses." *Commonwealth* v. *Nunes*, 430 Mass. 1, 7 (1999). See *Commonwealth* v. *Triplett*, 398 Mass. 561, 567 (1986).

In *Triplett*, we reversed a defendant's conviction because "the Commonwealth repeatedly asked [the defendant] about those parts of [another witness's] testimony that contradicted

---

[8]The prosecutor began her cross-examination of the defendant as follows:

*Q*: "Sir, would you agree that you've had the advantage of hearing all the testimony in this case before you took the stand?"

*A*: "Yes."

*Q*: "So you've heard everybody's version of what they say happened before you've taken the stand?"

*A*: "Yes."

[9]In contrast, the prosecutor in *Person* made an extended argument in closing that the defendant's retention of an attorney demonstrated consciousness of guilt, and that the defendant sat and listened to testimony for six days in order to give "a completely tailored cover story covering every single aspect" of the Commonwealth's case. *Commonwealth* v. *Person*, 400 Mass. 136, 138-139 (1987).

[10]For example, the prosecutor asked the defendant: "Are you saying Melissa was lying?"

his own." *Id.* at 566. In *Triplett*, the Commonwealth persisted in questioning the defendant about the veracity of testimony given by the defendant's mother despite the fact that the defendant had asserted that he did not remember the incident in question. This questioning was so intense that it prompted the defendant to exclaim, "I'm not going to call my mother a liar." *Id.* at 566 n.5. We noted that "[t]his form of questioning permeated the entire cross-examination of the witness." *Id.*

Here, the focus of the improper questions was not Gaulin's most damaging testimony — that involving the defendant's inculpatory statements after the murder — rather, the questions came in the context of inquiring as to the defendant's whereabouts in the days prior to the murder. In addition, most of the prosecutor's questions focused on whether the defendant had heard Gaulin's testimony.[11] In these circumstances, we conclude that "the error did not influence the jury, or had but very slight effect." *Commonwealth* v. *Christian*, 430 Mass. 552, 563 (2000), quoting *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994). *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983). The error does not require a new trial.

(e) *Burden shifting.* According to eyewitness testimony, the perpetrator of the murder wore dark blue pants and a dark, hooded sweatshirt. The defendant, however, testified that, on the day of the murder, he wore a white T-shirt with the words "we are the world" printed on the back and stone-washed blue jeans. Although the Commonwealth had in its possession at least the T-shirt, during cross-examination, the prosecutor asked the defendant: "did you bring with you today the . . . sneakers, the stone-washed jeans, or the white T-shirt you had on?"[12] The prosecutor's question implied that, because the defendant could not produce the clothes, he was lying.

"A prosecutor may not conduct cross-examination 'in bad faith or without foundation.' " *Commonwealth* v. *Christian, supra* at 561, citing *Commonwealth* v. *White*, 367 Mass. 280, 285 (1975). The prosecutor's question was improper because its sole purpose was to "impl[y] the truth of a proposition [s]he kn[ew] to be false" — that, because the defendant could not produce the evidence the Commonwealth had in its possession, the

---

[11]In fact, there were a number of other instances in which the prosecutor noted that the defendant's testimony agreed with that of Gaulin.

[12]Defense counsel did not object to this question or raise this issue in the defendant's motion for a new trial.

defendant was lying. See *Commonwealth* v. *Christian, supra,* citing P.J. Liacos, Massachusetts Evidence § 3.2, at 52 (7th ed. 1999).

The defendant argues that the effect of the prosecutor's improper question was to shift to him the burden of producing exculpatory evidence. We disagree. Shortly after the prosecutor asked the improper question, the Commonwealth introduced in evidence the T-shirt with "we are the world" printed on the back: the jurors, therefore, were cognizant of the fact that at least some of the clothing was in the Commonwealth's possession all along. See *Commonwealth* v. *Christian, supra* at 563. Furthermore, the judge correctly instructed the jurors that the fact that the defendant took the stand "did not shift any burden away from the Commonwealth . . . to the defendant . . . . The burden remains totally with the Commonwealth, and never shifts to the defendant." We are satisfied that, although the prosecutor's question was improper, the jurors understood the appropriate burden of proof and, therefore, that the single question did not create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Ruddock,* 428 Mass. 288, 292 & n.3 (1998).

(f) *The cumulative effect of the alleged errors.* The defendant argues that, even if none of the above errors requires reversal separately, the combined effect of the mistakes was so prejudicial that it created a substantial likelihood of a miscarriage of justice. We disagree. The cumulative error was no more prejudicial than the individual errors, which had minimal impact. *Commonwealth* v. *Kosilek,* 423 Mass. 449, 457 (1996).

4. *Other errors alleged.* The defendant claims that a number of additional errors were made at his trial. We disagree. These claims "require us to apply established principles of law to specific facts of [the defendant's] case. . . . We shall deal with such issues only to the extent necessary to show that we are aware of the defendant's contentions and to apply the established law." *Commonwealth* v. *Hartford,* 425 Mass. 378, 379 n.1 (1997).

(a) *Jury irregularities.* The judge's denial of the defendant's motion to remove three jurors after they were followed from the courtroom by a group of spectators was proper. See G. L. c. 234, § 26B. The judge held a hearing, out of the presence of the other jurors and with both counsel present, at which each juror involved in the incident was questioned. See *Commonwealth* v.

*Young,* 401 Mass. 390, 406 (1987); *Commonwealth* v. *Haywood,* 377 Mass. 755, 767 (1979). Each of the jurors stated that he or she could render a fair verdict. "[A] judge may properly rely on a juror's statement that he remains impartial." *Commonwealth* v. *Gregory,* 401 Mass. 437, 444 (1988). See *Commonwealth* v. *Kamara,* 422 Mass. 614, 615 (1996). "The judge determined that no good cause was shown necessitating the discharge of the juror[s]; there was no abuse of her discretion . . . ." *Commonwealth* v. *Young, supra.* See *Commonwealth* v. *Samuel,* 398 Mass. 93, 96 (1986); *Commonwealth* v. *Haywood, supra* at 769.[13]

The judge's inquiry into the three jurors' ability to act impartially was proper. Although "in general . . . our law does not permit inquiry into 'the subjective mental processes of jurors, such as the reasons for their decisions,'." the judge's questions were confined to the jurors' assessment of their ability to remain impartial. *Commonwealth* v. *Hebert,* 379 Mass. 752, 755 (1980), quoting *Commonwealth* v. *Fidler,* 377 Mass. 192, 198 (1979). Such inquiry is regularly employed in ascertaining whether an individual should sit on a jury and is distinguishable from improper questioning about a deliberating juror's thought processes. See *Commonwealth* v. *Kamara, supra.* There is nothing improper in repeating such questions if the circumstances so warrant. See *id.; Commonwealth* v. *Gregory, supra.*

(b) *Exclusion of Abreu's arrest.* The judge's exclusion, over the defendant's objection, of evidence that Jaquay Abreu, the victim's wife, was arrested and arraigned on drug-related charges after the murder, but before the defendant's trial, was proper. Because Abreu's testimony did not differ from her pre-arrest statements, there was no basis for claiming that Abreu

---

[13]The defendant is incorrect in asserting that due process requires that, once evidence indicates that an individual juror has been subject to improper influence, the court must inquire individually of all remaining sitting jurors. Unless the risk of a taint "is determined to exist, individual questioning is not required and, as we have said repeatedly, that determination is subject to the judge's broad discretion." *Commonwealth* v. *Kendrick,* 404 Mass. 298, 303 (1989). See *Commonwealth* v. *Costa,* 414 Mass. 618, 630 (1993). There was no suggestion that the three jurors who were followed mentioned the incident to any of the other jurors. The judge acted properly. See *Commonwealth* v. *Jackson,* 376 Mass. 790, 797, 799 (1978) (denial of defendant's request for individual questioning of jurors after exposure to newspaper article did not "unconstitutionally deny the defendant a fair trial").

changed her testimony in order to curry favor with the Commonwealth. See *Commonwealth* v. *Purcell*, 423 Mass. 880, 884 (1996), and cases cited. Also, the judge's voir dire colloquy of the witness indicated that the defendant's line of questioning would not produce material testimony as to whether Abreu was biased in favor of the Commonwealth. See *Commonwealth* v. *Haywood, supra* at 761. There was no error in excluding evidence of the arrest.

(c) *Alleged prosecutorial misconduct.* (1) *Implying knowledge of firearms.* The prosecutor's questions whether the defendant knew about firearms because he had served in the military were proper. The defendant raised the issue of his military training on direct examination, and the Commonwealth was entitled to probe further based on the reasonable inference that an individual with military training has experience with firearms. When the scope of the defendant's knowledge of firearms became clear, the prosecutor proceeded to another topic. Contrast *Commonwealth* v. *Simmons,* 419 Mass. 426 (1995).

The defendant also argues that the prosecutor made improper comments during her summation about the defendant's testimony as to his military service.[14] The prosecutor's comments did not go "beyond logical inferences that could be drawn from the evidence." *Id.* at 434. Also, there was abundant additional evidence that the defendant was familiar with the murder weapon: he possessed the weapon prior to the murder, and an eyewitness saw the defendant shoot the victim. See *id.* There was no error.

(2) *Missing witness inference.* The defendant claims that the prosecutor's questions as to an employment interview the defendant had on the day of the murder improperly raised a missing witness inference adverse to the defendant.[15] Cf. *Commonwealth* v. *Cobb,* 397 Mass. 105, 108 (1986). The defendant's argument lacks merit. No missing witness instruction was

---

[14]The prosecutor said: "Now, we thought . . . that we might get some more information on firearms from the man that's been in the military for five years, but apparently he has little to no knowledge, except something about cannons and M-16s, so we could not learn anything more from the defendant, but we suggest that you heard adequate information to help you decide this case."

[15]The interview was relevant to the question of what clothing the defendant wore that day.

argued, sought, or given. Cf. *id.* Nothing in the prosecutor's questions suggested that the interviewer possessed either exculpatory or inculpatory evidence. The questions were not improper.

(3) *Consciousness of guilt.* While in the police station, the defendant told Gaulin to "remember that he didn't do it." In her closing argument, the prosecutor told the jurors that "[t]hose were the defendant's words. That's what he wanted Melissa to say. That's what he wants us to say. But the evidence tells us to say something quite different."[16] The defendant claims that this argument was improper.

" 'In closing argument, counsel may argue the evidence and the fair inferences which can be drawn from the evidence.' . . . 'Counsel may also attempt to assist the jury in their task of analyzing, evaluating, and applying evidence. Such assistance includes suggestions by counsel as to what conclusions the jury should draw from the evidence' " (citations omitted). *Commonwealth* v. *Raymond*, 424 Mass. 382, 390 (1997), quoting *Commonwealth* v. *Lamrini*, 392 Mass. 427, 431 (1984). The prosecutor's inference that the defendant was attempting to keep Gaulin quiet about his inculpatory statements was based on facts in evidence. There was no error.

(4) *"Taunting" the defendant.* The defendant's claim that the prosecutor "taunted" the defendant lacks merit. Cf. *Commonwealth* v. *DeMars*, 42 Mass. App. Ct. 788, 792 (1997). One point of contention was whether, before the murder, the victim went to the defendant's apartment to find the defendant or to bring food to the defendant's father. In cross-examining the defendant, the prosecutor asked, "So you're saying that there was plenty of food for your father, the chef, to eat?" The evidence indicated that the defendant's father was a chef. There was no error.

(5) *Defendant's silence.* Inspector Gerald Wayne of the Lowell police department testified to a post-Miranda interview with

---

[16]The prosecutor noted that, on seeing Gaulin at the police station, the defendant might have become concerned. "He doesn't what's [*sic*] she's doing there, he doesn't know what she has said or, worse, what she's going to say, so he has to give you some kind of signal, perhaps even an order, if you will. . . . If the defendant did not do it, why did he feel such a need to remind his girlfriend that he did not do it."

the defendant.[17] During direct examination, Inspector Wayne stated that, toward the end of the interview, the defendant said that he knew the police had been looking for him and that he had hidden in a vacant apartment during an earlier police visit. The prosecutor asked Inspector Wayne what happened next during the interview. According to Inspector Wayne, when the defendant was asked why he knew the police were looking for him, "he stated he didn't want to talk anymore, and . . . terminated the interview." Although the defendant did not object to this testimony,[18] the defendant claims on appeal that the prosecutor improperly questioned Inspector Wayne about the termination of the interview with the defendant.

"A defendant's silence after the police have given the warnings mandated by *Miranda* v. *Arizona*, 384 U.S. 436, 467-479 (1966), may not be used against that defendant. . . . [T]o do so would 'penalize' the invocation of the right to silence." *Commonwealth* v. *Waite*, 422 Mass. 792, 797 (1996), citing *Doyle* v. *Ohio*, 426 U.S. 610 (1974). See *Commonwealth* v. *Person*, *supra* at 140. "Still, in a few situations evidence of silence is properly admitted because it is not 'used against' the accused." *Commonwealth* v. *Waite*, *supra* at 798, citing *Commonwealth* v. *Habarek*, 402 Mass. 105 (1988), *S.C.*, 421 Mass. 1005 (1995).

Inspector Wayne's testimony was "introduced in the context of the entire conversation, and was admitted so as not to leave the jury wondering why the interview ended abruptly." *Commonwealth* v. *Habarek*, *supra* at 110. See *Commonwealth* v. *Waite*, *supra* at 798. "When the defendant has temporarily waived the right to silence, testimony regarding the cessation of questioning is appropriate to prevent . . . confusion." *Id*. See *Commonwealth* v. *Habarek*, *supra*. In addition, "at no time did the Commonwealth use this single response either as evidence of guilt or to impeach an explanation . . . offered at trial." *Commonwealth* v. *Ferreira*, 381 Mass. 306, 314 (1980). The prosecutor's question was proper.

Although there was no error in this line of questioning in the context of the defendant's trial, we note that, at the defendant's request, the judge should instruct the jurors, at the time of the

---

[17]On appeal, the defendant does not argue any error in the judge's conclusion that he knowingly, intelligently, and voluntarily waived his rights after the initial Miranda warnings.

[18]The defendant did object to questioning which might have gone beyond the above testimony and that was excluded.

testimony, that a defendant has a constitutional right not to answer any questions asked by the police. On such request by the defendant, the judge should also instruct the jurors that testimony regarding the termination of a post-Miranda interview was admitted only for the purpose of explaining why the interview ended and that the jurors should not draw any adverse inference against the defendant because of his silence. See *Commonwealth* v. *Fowler, ante* at 30, 38-39 (2000).

(d) *Failure to instruct on manslaughter.* The judge did not err in failing to instruct the jurors on manslaughter. "If any view of the evidence in a case would permit a verdict on manslaughter rather than murder, a manslaughter charge should be given." *Commonwealth* v. *Brooks*, 422 Mass. 574, 578 (1996). "In determining whether such an instruction is warranted, we view the evidence in the light most favorable to the defendant." *Commonwealth* v. *Pierce*, 419 Mass. 28, 31 (1994).

All the evidence showed that the victim was sitting in his parked vehicle and the defendant was outside the vehicle when he fired the gun. No evidence suggested that the victim was threatening the defendant at that time. Nor did any evidence suggest that the defendant acted on reasonable provocation "before sufficient time had elapsed for the accused's temper to cool." *Commonwealth* v. *Pierce, supra.* See *Commonwealth* v. *Brooks, supra,* quoting *Commonwealth* v. *Nichypor*, 419 Mass. 209, 216 (1994), quoting *Commonwealth* v. *Soaris*, 275 Mass. 291, 299 (1931). Furthermore, the defendant's theory at trial was not that he was provoked, but that he was not present when the victim was murdered. No manslaughter instruction was warranted in these circumstances. See *Commonwealth* v. *Brooks, supra.*[19]

5. *Ineffective assistance of counsel.* The defendant makes a claim of ineffective assistance of counsel at trial. We review to determine whether "better work might have accomplished something material for the defense," *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977), or whether any error created a substantial likelihood of a miscarriage of justice, *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). We conclude that the defendant is not entitled to a new trial on the ground of ineffective assistance of counsel.

---

[19]The defendant in his first brief asserted that a self-defense instruction should have been given. There is no basis on this record for a self-defense instruction.

(a) *Failure to object to prosecutorial misconduct.* In addressing the defendant's various claims of error, we concluded that none of the alleged errors created a substantial likelihood of a miscarriage of justice. "[T]he defendant asks us to determine that the trial counsel's failure to object to these errors constituted ineffective assistance of counsel. '[I]f an error not objected to by trial counsel does not create a substantial likelihood of a miscarriage of justice, see G. L. c. 278, § 33E[,] . . . a claim of ineffective assistance of counsel with respect to such error will not succeed.' " *Commonwealth* v. *Kosilek,* 423 Mass. 449, 457-458 (1996), quoting *Commonwealth* v. *Wright,* 411 Mass. 678, 681-682 (1992), citing *Commonwealth* v. *Waite,* 422 Mass. 792, 807 (1996). The defendant's claim, therefore, fails.

(b) *Failure to impeach Melissa Gaulin.* Gaulin testified that, when the defendant returned to his sister's apartment on the night of the murder, "[h]e was sweating and shaking." He said either "I did it" or "we did it," and told Gaulin that "he didn't want to kill him." He also told her that "we got rid of it [the gun]."

The defendant argues that Gaulin's testimony was critical to the Commonwealth's case against him. According to the defendant, his trial counsel might have been more effective in undermining Gaulin's testimony. We do not think that "better work might have accomplished something material for the defense," *Commonwealth* v. *Satterfield, supra,* or that defense counsel's representation created a substantial likelihood of a miscarriage of justice, *Commonwealth* v. *Wright, supra* at 682.

(1) *Police coercion.* Gaulin gave two statements to the police. In the first, she provided an alibi for the defendant. In the second, she described the defendant's inculpatory behavior after the murder. The trial judge, who decided the defendant's motion for a new trial, found that the police threatened Gaulin before each of her statements. The defendant now argues that his trial counsel was ineffective because he did not question Gaulin about the threats.

In the memorandum denying the defendant's motion for a new trial, the judge noted that the threats were made before both the inculpatory and the exculpatory statements that Gaulin gave to the police. In these circumstances, bringing in evidence of these threats for impeachment purposes would not "have accomplished something material for the defense." *Commonwealth* v. *Satterfield, supra.*

(2) *Prior consistent and inconsistent statements.* On direct examination, Gaulin testified to the defendant's inculpatory statements. She also testified to the two inconsistent statements she gave the police about the defendant's behavior after the murder. Although the first of these statements was inconsistent with Gaulin's trial testimony, the second statement corroborated that testimony.

The defendant argues that trial counsel was ineffective for failing to object to the admission of the statement that corroborated Gaulin's testimony and for failing to impeach Gaulin with the statement that was inconsistent with her testimony. Counsel was not ineffective for failing to object to the introduction of testimony that had the effect of showing that the Commonwealth's witness had given two contradictory statements to the police. Indeed, the defendant could point to the fact that the Commonwealth itself had proved the misstatements and, on that basis, the Commonwealth's evidence should not be believed. The admission of this evidence did not create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright, supra* at 682.

We also disagree with the defendant's complaint that his trial counsel was not emphatic enough in impeaching Gaulin because she described the defendant as saying both "we did it" and "I did it." In order to advance the theory that the defendant was not the perpetrator, defense counsel did question Gaulin as to her waffling between these two descriptions. It is not ineffective not to belabor a point.

(3) *Motive to lie.* The defendant argues that his counsel should have put before the jurors a letter in which Gaulin expressed her anger at the defendant for leaving her. Gaulin wrote: "I don't want to hurt you [and] you know how I can so please don't hurt me." We agree with the Commonwealth and the judge that the import of this statement is ambiguous. We are also persuaded that, had defense counsel introduced a portion of the letter, the Commonwealth could have introduced the remainder of the letter, in which Gaulin promised to "stay by" the defendant and expressed a desire to prove her love to him. See *Commonwealth* v. *Watson,* 377 Mass. 814, 826-831 (1979), *S.C.,* 409 Mass. 110 (1991) (discussing verbal completeness doctrine). Where a witness's prior statements are "as harmful as or more harmful to the defendant than her trial testimony," defense counsel was not ineffective in not using those state-

ments to impeach. *Commonwealth* v. *Rosado*, 408 Mass. 561, 569 (1990).

6. *Conclusion.* We have reviewed the record as a whole and conclude that there is no reason to exercise our power under G. L. c. 278, § 33E, to order a new trial, or to enter a lesser degree of guilt on the conviction of murder in the first degree.

*Judgment affirmed.*